# UNITED PUBLIC WORKERS OF AMERICA (C. I. O.) ET AL. *v*. MITCHELL ET AL.

No. 20.  Argued December 3, 1945.  Reargued October 17, 1946.—
Decided February 10, 1947.

*Lee Pressman* argued the cause for appellants. With him on the brief were *Frank Donner* and *Milton V. Freeman.*

*Ralph F. Fuchs* argued the cause for appellees. With him on the brief were *Solicitor General McGrath, Assistant Attorney General Sonnett, David L. Kreeger* and *Abraham J. Harris.*

78

MR. JUSTICE REED delivered the opinion of the Court.

The Hatch Act,* enacted in 1940, declares unlawful certain specified political activities of federal employees.[1] Section 9 forbids officers and employees in the executive branch of the Federal Government, with exceptions, from taking "any active part in political management or in political campaigns." [2] Section 15 declares that the activ-

*Another controversy under the same act is decided today. *Oklahoma* v. *United States Civil Service Commission, post,* p. 127.

[1] August 2, 1939, 53 Stat. 1147; July 19, 1940, 54 Stat. 767; 56 Stat. 181, 986; 58 Stat. 136, 148, 727; 59 Stat. 108, 658; 60 Stat. 937. Only the first two are important for consideration of this case.

[2] 18 U. S. C. § 61h, as amended:

["(a) It shall be unlawful for any person employed in the executive branch of the Federal Government, or any agency or department thereof, to use his official authority or influence for the purpose of interfering with an election or affecting the result thereof. No officer or employee in the executive branch of the Federal Government, or any agency or department thereof, except a part-time officer or part-time employee without compensation or with nominal compensation serving in connection with the existing war effort, other than in any capacity relating to the procurement or manufacture of war material shall take any active part in political management or in political campaigns.] All such persons shall retain the right to vote as, they may choose and to express their opinions on all political subjects and candidates. For the purposes of this section the term 'officer' or 'employee' shall not be construed to include (1) the President and Vice President of the United States; (2) persons whose compensation is paid from the appropriation for the office of the President; (3) heads and assistant heads of executive departments; (4) officers who are appointed by the President, by and with the advice and consent of the Senate, and who determine policies to be pursued by the United States in its relations with foreign powers or in the Nationwide administration of Federal laws.

["(b) Any person violating the provisions of this section shall be immediately removed from the position or office held by him, and thereafter no part of the funds appropriated by any Act of Congress for such position or office shall be used to pay the compensation of such person." 53 Stat. 1147, 1148; 54 Stat. 767; 56 Stat. 181.]

ities theretofore determined by the United States Civil Service Commission to be prohibited to employees in the classified civil service of the United States by the Civil Service Rules shall be deemed to be prohibited to federal employees covered by the Hatch Act.[3]   These sections of the Act cover all federal officers and employees whether in the classified civil service or not and a penalty of dismissal from employment is imposed for violation.   There is no designation of a single governmental agency for its enforcement.

For many years before the Hatch Act the Congress had authorized the exclusion of federal employees in the competitive classified service from active participation in political management and political campaigns.[4]   In June, 1938,

---

[3] 18 U. S. C. § 61o:

"The provisions of this subchapter which prohibit persons to whom such provisions apply from taking any active part in political management or in political campaigns shall be deemed to prohibit the same activities on the part of such persons as the United States Civil Service Commission has heretofore determined are at the time this section takes effect prohibited on the part of employees in the classified civil service of the United States by the provisions of the civil-service rules prohibiting such employees from taking any active part in political management or in political campaigns."   54 Stat. 767, 771.

[4] See Civil Service Act (1883), § 2, 22 Stat. 403-404:

"Sec. 2.  That it shall be the duty of said commissioners:

"First.  To aid the President, as he may request, in preparing suitable rules for carrying this act into effect, and when said rules shall have been promulgated it shall be the duty of all officers of the United States in the departments and offices to which any such rules may relate to aid, in all proper ways, in carrying said rules, and any modifications thereof, into effect.

"Second.  And, among other things, said rules shall provide and declare, as nearly as the conditions of good administration will warrant, as follows:

.          .          .          .          .

"Sixth, that no person in said service has any right to use his official

the congressional authorization for exclusion had been made more effective by a Civil Service Commission dis-, ciplinary rule.[5]   That power to discipline members of, the competitive classified civil service continues in the Commission under the Hatch Act by virtue of the present applicability of the Executive Order No. 8705, March 5, 1941.   The applicable Civil Service Commission rules are.

---

authority or influence to coerce the political action of any person or body."

5 U. S. C. § 631:

"The President is authorized to . . . establish regulations for the conduct of persons who may receive appointments in the civil service."

First Annual Report, Civil Service Commission, H. R. Ex. Doc. No. 105, 48th Cong., 1st Sess., p. 45:

"In the exercise of the power vested in the President by the Constitution, and by virtue of the 1753d section of the Revised Statutes, and of the civil service act approved January 16, 1883, the following rules for the regulation and improvement of the executive civil service are hereby amended and promulgated:

### RULE I.

"No person in said service shall use his official authority or influence either to coerce the political action of any person or body or to interfere with any election."

Executive Order No. 642, June 3, 1907 (amended to consolidate without changing wording, Executive Order No. 655, June 15, 1907); Twenty-Fourth Annual Report, Civil Service Commission, House Doc. No. 600, 60th Cong., 1st Sess., p. 104:

"Section 1 of Rule I of the civil-service rules is hereby amended to read as follows:

"No person in the Executive civil service shall use his official authority or influence for the purpose of interfering with an election or affecting the result thereof.   Persons who, by the provisions of these rules are in the competitive classified service, while retaining the right to vote as they please and to express privately their opinions on all political subjects, shall take no active part in political management or in political campaigns."

[5] Civil Service Rules 15, 3 Fed. Reg. 1525.

printed in the margin.[6]   The only change in the Civil Service Rules relating to political activity, caused by the Hatch Act legislation, that is of significance in this case is the elimination on March 5, 1941, of the word "privately" from the phrase "to express privately their opinions." This limitation to private expression had regulated classified personnel since 1907.[7]

The present appellants sought an injunction before a statutory three-judge district court of the District of Co-

[6] 5 C. F. R., Cum. Supp., § 1.1: *"No interference with elections.* No person in the executive civil service shall use his official authority or influence for the purpose of interfering with an election or affecting the results thereof. Persons who by the provisions of the rules in this chapter are in the competitive classified service, while retaining the right to vote as they please and to express their opinion on all political subjects, shall take no active part in political management or in political campaigns."

Section 15.1: *"Legal appointment necessary to compensation.* Whenever the Commission finds, after due notice and opportunity for explanation, that any person has been appointed to or is holding any position, whether by original appointment, promotion, assignment, transfer, or reinstatement, in violation of the Civil Service Act or Rules, or of any Executive order or any regulation of the Commission, or that any employee subject thereto has violated such Act, Rules, orders, or regulations, it shall certify the facts to the proper appointing officer with specific instructions as to discipline or dismissal of the person or employee affected. If the appointing officer fails to carry out the instructions of the Commission within 10 days after receipt thereof, the Commission shall certify the facts to the proper disbursing and auditing officers, and such officers shall make no payment or allowance of the salary or wages of any such person or employee thereafter accruing."

See E. O. 8705, March 5, 1941, 6 Fed. Reg. 1313.

[7] See note 4, *supra,* and 5 C. F R. § 1.1, June 1, 1938.

A change occurred also in Rule 15. This was to comply with a ruling of the Attorney General that the Hatch Act made removal from office a mandatory penalty for forbidden political activity. 40 Op. A. G., Political Activity by Government Employees, January 8, 1941. See note 5, *supra,* for Rule 15 prior to Hatch Act.

lumbia against appellees, members of the United States Civil Service Commission, to prohibit them from enforcing against appellants the provisions of the second sentence of § 9 (a) of the Hatch Act for the reason that the sentence is repugnant to the Constitution of the United States.[8] A declaratory judgment of the unconstitutionality of the sentence was also sought.[9] The sentence referred to reads, "No officer or employee in the executive branch of the Federal Government . . . shall take any active part in political management or in political campaigns."

Various individual employees of the federal executive civil service and the United Public Workers of America,[10] a labor union with these and other executive employees as members, as a representative of all its members, joined in the suit. It is alleged that the individuals desire to engage in acts of political management and in political campaigns. Their purposes are as stated in the excerpt from the complaint set out in the margin.[11] From the

[8] See 28 U. S. C. § 380 (a) ; § 11–306 District of Columbia Code.

[9] Judicial Code § 274d; 28 U. S. C. § 400.

[10] No contention that appellant, United Public Workers of America (C. I. O.), lacked capacity to bring this action is made by appellees. We need not consider the question here. *McCandless* v. *Furlaud*, 293 U. S. 67, 73–74. See *Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U. S. 275.

[11] "In discharge of their duties of citizenship, of their right to vote, and in exercise of their constitutional rights of freedom of speech, of the press, of assembly, and the right to engage in political activity, the individual plaintiffs desire to engage in the following acts: write for publication letters and articles in support of candidates for office; be connected editorially with publications which are identified with the legislative program of UFWA [former name of the present union appellant] and candidates who support it; solicit votes, aid in getting out voters, act as accredited checker, watcher, or challenger; transport voters to and from the polls without compensation therefor; participate in and help in organizing political parades; initiate petitions, and canvass for the signatures of others on such petitions; serve as party

affidavits it is plain, and we so assume, that these activities will be carried on completely outside of the hours of employment. Appellants challenge the second sentence of § 9 (a) as unconstitutional for various reasons. They are set out below in the language of the complaint.[12]

None of the appellants, except George P. Poole, has violated the provisions of the Hatch Act. They wish to act contrary to its provisions and those of § 1 of the Civil Service Rules and desire a declaration of the legally per-

---

ward committeeman or other party official; and perform any and all acts not prohibited by any provision of law other than the second sentence of Section 9 (a) and Section 15 of the Hatch Act, which constitute taking an active part in political management and political campaigns."

[12] "The second sentence of Section 9 (a) of the Hatch Act is repugnant to the Constitution of the United States as a deprivation of freedom of speech, of the press, and of assembly in violation of the First Amendment.

"The second sentence of Section 9 (a) of the Hatch Act is repugnant to the Constitution of the United States as a deprivation of the fundamental right of the people of the United States to engage in political activity, reserved to the people of the United States by the Ninth and Tenth Amendments.

"The second sentence of Section 9 (a) of the Hatch Act is repugnant to the Constitution of the United States, since it unreasonably prohibits Federal employees from engaging in activities which may be lawfully carried on by persons who are not Federal employees, thus constituting a deprivation of liberty in violation of the Fifth Amendment.

"The second sentence of Section 9 (a) of the Hatch Act is repugnant to the Constitution of the United States since it effects an arbitrary and grossly unreasonable discrimination between employees of the Federal Government in the classified civil service subject to its provisions and employees specifically exempted therefrom, in violation of the Fifth Amendment.

"The second sentence of Section 9 (a) of the Hatch Act is repugnant to the Constitution of the United States since it is so vague and indefinite as to prohibit lawful activities as well as activities which are properly made unlawful by other provisions of law, in violation of the Fifth Amendment."

missible limits of regulation. Defendants moved to dismiss the complaint for lack of a justiciable case or controversy. The District Court determined that each of these individual appellants had an interest in their claimed privilege of engaging in political activities, sufficient to give them a right to maintain this suit. *United Federal Workers of America (C. I. O.)* v. *Mitchell,* 56 F. Supp. 621, 624. The District Court further determined that the questioned provision of the Hatch Act was valid and that the complaint therefore failed to state a cause of action. It accordingly dismissed the complaint and granted summary judgment to defendants.

*First.* The judgment of the District Court was entered on September 26, 1944. An order was duly entered on October 26, 1944, allowing an appeal. 28 U. S. C. § 380a. The same section of the statutes provides: "In the event that an appeal is taken under this section, the record shall be made up and the case docketed in the Supreme Court of the United States within sixty days from the time such appeal is allowed, under such rules as may be prescribed by the proper courts." This appeal was not docketed in this Court until February 2, 1945, a date after the return date of the order under § 380a. Thereafter the Government suggested a lack of jurisdiction in this Court to consider the appeal because of the failure of appellants to docket the appeal in time. We postponed consideration of our jurisdiction over this appeal to the hearing. We proceed now to a disposition of this question.

To comply with the suggestion of § 380a, this Court adopted Rule 47.[13] In other cases of appeals, Rule 11

---

[13] Rules of the Supreme Court of the United States, Rule 47:

"Appeals to this court under the Act of August 24, 1937, shall be governed, as far as may be, by the rules of this court regulating the procedure on appeal in other cases from courts of the United States; . . . The record shall be made up and the case docketed in this court within sixty days from the time the appeal is allowed."

governs docketing.[14]   If Rule 11 applies also to appeals under § 380a, we may hear this appeal, for the steps for dismissal required by Rule 11 were not taken by the appellees. This is because upon the allowance of an appeal by a judge of the district court as here, Supreme Court Rules 10 and 36, the case is transferred from the district court to this Court and subsequent steps for dismissal or affirmance are to be taken here.[15]   If, however, the above-quoted provision of § 380a as to docketing is a prerequisite to the power of this Court to review, this appeal must fail.

Prior to the passage of § 380a, appeals docketed after the return day were governed by Rule 11, 275 U. S. 602. In principle it has long been in existence.[16]   By the words of the rule, it appears that dismissal for appellant's tardiness in docketing requires a step by the appellee.   Even after dismissal for failure to docket, the rule permits this Court to allow the appellant to docket.   Noth-

---

[14] *Id.*, Rule 11: "1. It shall be the duty of the appellant to docket the case and file the record thereof with the clerk of this court by or before the return day, whether in vacation or in term time.   But, for good cause shown, the justice or judge who signed the citation, or any justice of this court, may enlarge the time, before its expiration, the order of enlargement to be filed with the clerk of this court.   If the appellant shall fail to comply with this rule, the appellee may have the cause docketed and the appeal dismissed upon producing a certificate, whether in term or vacation, from the clerk of the court wherein the judgment or decree was rendered, stating the case and certifying that such appeal has been duly allowed.   And in no case shall the appellant be entitled to docket the cause and file the record after the appeal shall have been dismissed under this rule, unless by special leave of the court."

[15] Steps allowed in the district court after the allowance of appeal, such as preparation of the record, extension of time and cost or supersedeas bonds, are for convenience taken in the court possessed of the record.   Rules 10, 11 and 36, Supreme Court; Rule 72, Rules of Civil Procedure.

[16] 3 Cranch 239; *Bingham* v. *Morris*, 7 Cranch 99; *Sparrow* v. *Strong*, 3 Wall. 97, 103.   Compare *Grigsby* v. *Purcell*, 99 U. S. 505.

ing in the legislative history which has been called to our attention indicates that Congress intended its docketing provision to vary Rule 11. Direct appeal accomplishes the congressional purpose of expediting review, of course, and is consistent with an unchanged practice as to dismissals. The time to docket may have been enlarged from the conventional return day of Rules 10 and 11 to bring continental uniformity, see Rule 10, or to give time for the preparation of a record which would often be large and not transcribed or printed. It will not expedite determination of constitutional questions to dismiss appeals because of errors of practice. In fact the sentence of § 380a on docketing seems deliberately to leave the practice on failure to docket to rules of court. We do not construe the requirement of docketing within sixty days as a limitation on our power to hear this appeal.

So far as our Rule 47 is concerned, we construe it as requiring in accordance with § 380a the docketing in sixty days from the allowance of the appeal, instead of the forty days of our Rule 10, and that, as to dismissals, the first sentence of Rule 47 requires the same practice for appeals under § 380a that Rule 11 does for other appeals. We think it desirable to have sufficient flexibility in the rule to permit extensions of the time for return in the unusual situations that occur when large records are involved. In view of the recognized congressional purpose to quicken review under § 380a, the discretion to delay final hearing allowed under Rule 11 will be exercised only on a definite showing of need therefor to assure fair review. This leads us to hear this appeal.[17]

*Second.* At the threshold of consideration, we are called upon to decide whether the complaint states a controversy cognizable in this Court. We defer consideration of the cause of action of Mr. Poole until section *Three* of this

---

[17] Compare *Georgia Lumber Co.* v. *Compania*, 323 U. S. 334.

opinion. The other individual employees have elaborated the grounds of their objection in individual affidavits for use in the hearing on the summary judgment. We select as an example one that contains the essential averments of all the others and print below the portions with significance in this suit.[18] Nothing similar to the fourth para-

---

[18] "At this time, when the fate of the entire world is in the balance I believe it is not only proper but an obligation for all citizens to participate actively in the making of the vital political decisions on which the success of the war and the permanence of the peace to follow so largely depend. For the purpose of participating in the making of these decisions it is my earnest desire to engage actively in political management and political campaigns. I wish to engage in such activity upon my own time, as a private citizen.

"I wish to engage in such activities on behalf of those candidates for public office who I believe will best serve the needs of this country and with the object of persuading others of the correctness of my judgments and of electing the candidates of my choice. This objective I wish to pursue by all proper means such as engaging in discussion, by speeches to conventions, rallies and other assemblages, by publicizing my views in letters and articles for publication in newspapers and other periodicals, by aiding in the campaign of candidates for political office by posting banners and posters in public places, by distributing leaflets, by 'ringing doorbells', by addressing campaign literature, and by doing any and all acts of like character reasonably designed to assist in the election of candidates I favor.

"I desire to engage in these activities freely, openly, and without concealment. However, I understand that the second sentence of Section 9 (a) of the Hatch Act and the Rules of the C. S. C. provide that if I engage in this activity, the Civil Service Commission will order that I be dismissed from federal employment. Such deprivation of my job in the federal government would be a source of immediate and serious financial loss and other injury to me.

"At the last Congressional election I was very much interested in the outcome of the campaign and offered to help the party of my choice by being a watcher at the polls. I obtained a watcher's certificate but I was advised that there might be some question of my right to use the certificate and retain my federal employment. Therefore, on November 1, 1943, the day before election, I called the regional office of the Civil Service Commission in Philadelphia and spoke to a

88

graph of the printed affidavit is contained in the other affidavits. The assumed controversy between affiant and the Civil Service Commission as to affiant's right to act as watcher at the polls on November 2, 1943, had long been moot when this complaint was filed. We do not therefore treat this allegation separately. The affidavits, it will be noticed, follow the generality· of purpose expressed by the complaint. See note 11 *supra.* They declare a desire to act contrary to the rule against political activity but not that the rule has been violated. In this respect, we think they differ from the type of threat adjudicated in *Railway Mail Association* v. *Corsi,* 326 U. S. 88. In that case, the refusal to admit an applicant to membership in a labor union on account of race was involved. Admission had been refused. 326 U. S. at p. 93, note 10. Definite action had also been taken in *Hill* v. *Florida,* 325 U. S. 538. In the *Hill* case an injunction had been sought and allowed against Hill and the union forbidding Hill from acting as the business agent of the union and the union from further functioning as a union until it complied with the state law. The threats which menaced the affiants of these affidavits in the case now being considered are closer to a general threat by officials to enforce those laws which they are charged to administer, compare *Watson* v. *Buck,* 313 U. S. 387, 400, than they are to the direct threat of punishment against a named organization for a completed act that made the *Mail Association* and the *Hill* cases justiciable.

person who gave his name as . . . Mr. . . . stated that if I used my watcher's certificate, the Civil Service Commission would see that I was dismissed from my job at the . . . for violation of the Hatch Act. I, therefore, did not use the certificate as I had intended.

"I believe that Congress may not constitutionally abridge my right to engage in the political activities mentioned above. However, unless the courts prevent the Civil Service Commission from enforcing this unconstitutional law, I will be unable freely to exercise my rights as a citizen." (Identifying words omitted.)

As is well known, the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.[19] For adjudication of constitutional issues, "concrete legal issues, presented in actual cases, not abstractions," are requisite.[20] This is as true of declaratory judgments as any other field.[21] These appellants seem clearly to seek advisory opinions upon broad claims of rights protected by the First, Fifth, Ninth and Tenth Amendments to the Constitution. As these appellants are classified employees, they have a right superior to the generality of citizens, compare *Fairchild* v. *Hughes,* 258 U. S. 126, but the facts of their personal interest in their civil rights, of the general threat of possible interference with those rights by the Civil Service Commission under its rules, if specified things are done by appellants, does not make a justiciable case or controversy. Appellants want to engage in "political management and political campaigns," to persuade others to follow appellants' views by discussion, speeches, articles and other acts reasonably designed to secure the selection of appellants' political choices. Such generality of objection is really an attack on the political expediency of the Hatch Act, not the presentation of legal issues. It is beyond the competence of courts to render such a decision. *Texas* v. *Interstate Commerce Commission,* 258 U. S. 158, 162. -

The power of courts, and ultimately of this Court, to pass upon the constitutionality of acts of Congress arises

[19] Correspondence & Public Papers of John Jay, Vol. 3, p. 486; *Hayburn's Case* and notes, 2 Dall. 409; *Alabama* v. *Arizona,* 291 U. S. 286, 291; *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 461.

[20] *Electric Bond & Share Co.* v. *Securities and Exchange Commission,* 303 U. S. 419, 443; *United States* v. *Appalachian Electric Power Co.,* 311 U. S. 377, 423; *Alabama State Federation of Labor* v. *McAdory, supra,* 461, and cases cited; *Coffman* v. *Breeze Corporations,* 323 U. S. 316, 324, and cases cited.

[21] *Altvater* v. *Freeman,* 319 U. S. 359, 363.

only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. We can only speculate as to the kinds of political activity the appellants desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication. It would not accord with judicial responsibility to adjudge, in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except when definite rights appear upon the one side and definite. prejudicial interferences upon the other.[22]

The Constitution allots the nation's judicial power to the federal courts. Unless these courts respect the limits of that unique authority, they intrude upon powers vested in the legislative or executive branches. Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between litigants, capable of effective determination. Judicial exposition upon political proposals is permissible only when necessary to decide definite issues between litigants. When the courts act continually within these constitutionally imposed boundaries of their power, their ability to perform their function as a balance for the people's protection against abuse of power by other branches of government remains unimpaired. Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would

---

[22] It has long been this Court's "considered practice not to decide abstract, hypothetical or contingent questions, . . . or to decide any constitutional question in advance of the necessity for its decision, . . . or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, . . . or to decide any constitutional question except with reference to the particular facts to which it is to be applied, . . . ." *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 461, and cases cited. See *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129.

become the organ of political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches. By these mutual checks and balances by and between the branches of government, democracy undertakes to preserve the liberties of the people from excessive concentrations of authority. No threat of interference by the Commission with rights of these appellants appears beyond that implied by the existence of the law and the regulations. *Watson* v. *Buck, supra,* p. 400. We should not take judicial cognizance of the situation presented on the part of the appellants considered in this subdivision of the opinion. [These reasons lead us to conclude that the determination of the trial court, that the individual appellants, other than Poole, could maintain this action, was erroneous.]

[*Third.* The appellant Poole does present by the complaint and affidavit matters appropriate for judicial determination.[23] The affidavits filed by appellees confirm that

---

[23] "I have for a long time been interested in political activities. Both before and since my employment in the United States Mint, I have taken an active part in political campaigns and political management. In the 28th Ward, 7th Division in the City of Philadelphia I am and have been a Ward Executive Committeeman. In that position I have on many occasions taken an active part in political management and political campaigns. I have visited the residents of my Ward and solicited them to support my party and its candidates; I have acted as a watcher at the polls; I have contributed money to help pay its expenses; I have circulated campaign literature, placed banners and posters in public places, distributed leaflets, assisted in organizing political rallies and assemblies, and have done any and all acts which were asked of me in my capacity as a Ward Executive Committeeman. I have engaged in these activities both before and after my employment in the United States Mint. I intend to continue to engage in these activities on my own time as a private citizen, openly, freely, and without concealment.

"However, I have been served with a proposed order of the United States Civil Service Commission, dated January 12, 1944, which advises me that because of the political activities mentioned above,

Poole has been charged by the Commission with political activity and a proposed order for his removal from his position adopted subject to his right under Commission procedure to reply to the charges and to present further evidence in refutation.[24]  We proceed to consider the controversy over constitutional power at issue between Poole and the Commission as defined by the charge and preliminary finding upon one side and the admissions of Poole's affidavit upon the other.  Our determination is limited to those facts.  This proceeding so limited meets the requirements of defined rights and a definite threat to interfere with a possessor of the menaced rights by a penalty for an act done in violation of the claimed restraint.[25]

and for no other reason, 'it is, . . ., the opinion of this Commission that George P. Poole, an employee of the United States Mint at Philadelphia, Pennsylvania, has been guilty of political activity in violation of Section 1, Civil Service Rule I' and that unless I can refute the charges that I have engaged in political activity, I will be dismissed from my position as a Roller in the United States Mint at Philadelphia, Pennsylvania."

[24] The tentative charge and finding reads:

I.

"It is charged: That . . .

"The said George P. Poole held the political party office of Democratic Ward Executive Committeeman in the City of Philadelphia, Pennsylvania.

"The said George P. Poole was politically active by aiding and assisting the Democratic Party in the capacity of worker at the polls on general election day, November 5, 1940, and assisted in the distribution of funds in paying party workers for their services on general election day, November 5, 1940."

III.

"The above described activity constitutes taking an active part in political management and in a political campaign in contravention of Section 1, Civil Service Rule I, and the regulations adopted by the Commissioners thereunder."

[25] *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273; *Altvater* v. *Freeman*, 319 U. S. 359, 364; *Nashville, C. & St. L. Ry.* v. *Wallace*, 288 U. S. 249, 260.

Because we conclude hereinafter that the prohibition of § 9 of the Hatch Act and Civil Service Rule 1, see notes 2 and 6 above, are valid, it is unnecessary to consider, as this is a declaratory judgment action, whether or not this appellant sufficiently alleges that an irreparable injury to him would result from his removal from his position.[26] Nor need we inquire whether or not a court of equity would enforce by injunction any judgment declaring rights.[27] Since Poole admits that he violated the rule against political activity and that removal from office is therefore mandatory under the act, there is no question as to the exhaustion of administrative remedies. The act provides no administrative or statutory review for the order of the Civil Service Commission. Compare *Stark* v. *Wickard,* 321 U. S. 288, 306–10; *Macauley* v. *Waterman S. S. Corporation,* 327 U. S. 540. As no prior proceeding, offering an effective remedy or otherwise, is pending in the courts, there is no problem of judicial discretion as to whether to take cognizance of this case. *Brillhart* v. *Excess Insurance Co.,* 316 U. S. 491, 496–97, dissent at 500; *Larson* v. *General Motors Corporation,* 134 F. 2d 450, 453. Under such circumstances, we see no reason why a declaratory judgment action, even though constitutional issues are involved, does not lie. See Rules of Civil Procedure, Rule 57. *Steele* v. *Louisville & Nashville Railroad Co.,* 323 U. S. 192, 197, 207; *Tunstall* v. *Brotherhood of*

---

[26] 28 U. S. C. § 400: "In cases of actual controversy except with respect to Federal taxes the courts of the United States shall have power upon petition, declaration, complaint, or other appropriate pleadings to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such."

*Aetna Life Insurance Co.* v. *Haworth,* 300 U. S. 227, 241; *Nashville, C. & St. L. Ry.* v. *Wallace,* 288 U. S. 249, 264.

[27] See *White* v. *Berry,* 171 U. S. 366, 377; *In re Sawyer,* 124 U. S. 200, 212.

*Locomotive Firemen & Enginemen,* 323 U. S. 210, 212, *et seq.*\*

*Fourth.* [This brings us to consider the narrow but important point involved in Poole's situation.[28] Poole's stated offense is taking an "active part in political management or in political campaigns." He was a ward executive committeeman of a political party and was politically active on election day as a worker at the polls and a paymaster for the services of other party workers. The issue for decision and the only one we decide is whether such a breach of the Hatch Act and Rule 1 of the Commission can, without violating the Constitution, be made the basis for disciplinary action.]

When the issue is thus narrowed, the interference with free expression is seen in better proportion as compared with the requirements of orderly management of administrative personnel. Only while the employee is politically active, in the sense of Rule 1, must he withhold expression of opinion on public subjects. See note 6. We assume that Mr. Poole would be expected to comment publicly as committeeman on political matters, so that indirectly there is an attenuated interference. We accept appellants' contention that the nature of political rights reserved to the people by the Ninth and Tenth Amendments are involved. The right claimed as inviolate may be stated as the right of a citizen to act as a party official or worker to further his own political views. Thus we

---

\*In *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, a declaratory judgment proceeding, p. 46, prior to the adoption of Rule 57, a proceeding before the N. L. R. B. was required. There is statutory judicial review from that Board's decisions, however.

[28] We agree with the Government that the complaint does not fail to state a cause of action against the Commission because it seeks relief against the Commission's action under the Hatch Act instead of Rule 1 of the Commission. So far as Poole's controversy is concerned, the act and the rule are the same.

have a measure of interference by the Hatch Act and the Rules with what otherwise would be the freedom of the civil servant under the First, Ninth and Tenth Amendments. And, if we look upon due process as a guarantee of freedom in those fields, there is a corresponding impairment of that right under the Fifth Amendment. Appellants' objections under the Amendments are basically the same.

We do not find persuasion in appellants' argument that such activities during free time are not subject to regulation even though admittedly political activities cannot be indulged in during working hours.[29] The influence of political activity by government employees, if evil in its effects on the service, the employees or people dealing with them, is hardly less so because that activity takes place after hours. Of course, the question of the need for this regulation is for other branches of government rather than the courts. Our duty in this case ends if the Hatch Act provision under examination is constitutional.

Of course, it is accepted constitutional doctrine that these fundamental human rights are not absolutes. The requirements of residence and age must be met. The essential rights of the First Amendment in some instances are subject to the elemental need for order without which the guarantees of civil rights to others would be a mockery.[30] The powers granted by the Constitution to the

[29] In labor-management relationships, it has been recognized by this Court that circumstances might justify the prohibition by employers of union activity by employees on the employer's property, even though carried out during non-working hours. *Republic Aviation Corp.* v. *National Labor Relations Board,* 324 U. S. 793, 803.

[30] *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571; *Cantwell* v. *Connecticut,* 310 U. S. 296, 304, 310; *Schneider* v. *State,* 308 U. S. 147, 165; *De Jonge* v. *Oregon,* 299 U. S. 353, 364; *Cox* v. *New Hampshire,* 312 U. S. 569, 574; *Prince* v. *Massachusetts,* 321 U. S. 158, 169; *Reynolds* v. *United States,* 98 U. S. 145.

Federal Government are subtracted from the totality of sovereignty originally in the states and the people. Therefore, when objection is made that the exercise of a federal power infringes upon rights reserved by the Ninth and Tenth Amendments, the inquiry must be directed toward the granted power under which the action of the Union was taken. If granted power is found, necessarily the objection of invasion of those rights, reserved by the Ninth and Tenth Amendments, must fail. Again this Court must balance the extent of the guarantees of freedom against a congressional enactment to protect a democratic society against the supposed evil of political partisanship by classified employees of government.

As pointed out hereinbefore in this opinion, the practice of excluding classified employees from party offices and personal political activity at the polls has been in effect for several decades. Some incidents similar to those that are under examination here have been before this Court and the prohibition against certain types of political activity by officeholders has been upheld. The leading case was decided in 1882. *Ex parte Curtis,* 106 U. S. 371. There a subordinate United States employee was indicted for violation of an act that forbade employees who were not appointed by the President and confirmed by the Senate from giving or receiving money for political purposes from or to other employees of the government on penalty of discharge and criminal punishment. Curtis urged that the statute was unconstitutional. This Court upheld the right of Congress to punish the infraction of this law. The decisive principle was the power of Congress, within reasonable limits, to regulate, so far as it might deem necessary, the political conduct of its employees. A list of prohibitions against acts by public officials that are permitted to other citizens was given. This Court said, p. 373:

> "The evident purpose of Congress in all this class of enactments has been to promote efficiency and

integrity in the discharge of official duties, and to maintain proper discipline in the public service. Clearly such a purpose is within the just scope of legislative power, and it is not easy to see why the act now under consideration does not come fairly within the legitimate means to such an end."

The right to contribute money through fellow employees to advance the contributor's political theories was held not to be protected by any constitutional provision. It was held subject to regulation. A dissent by Mr. Justice Bradley emphasized the broad basis of the Court's opinion. He contended that a citizen's right to promote his political views could not be so restricted merely because he was an official of government.[31]

No other member of the Court joined in this dissent. The conclusion of the Court, that there was no constitutional bar to regulation of such financial contributions of public servants as distinguished from the exercise of political privileges such as the ballot, has found acceptance in the subsequent practice of Congress and the growth of the principle of required political neutrality for classified public servants as a sound element for efficiency.[32] The con-

---

[31] 106 U. S. 376–77: ". . . every citizen having the proper qualifications has the right to accept office, and to be a candidate therefor. This is a fundamental right of which the legislature cannot deprive the citizen, nor clog its exercise with conditions that are repugnant to his other fundamental rights. Such a condition I regard that imposed by the law in question to be. It prevents the citizen from co-operating with other citizens of his own choice in the promotion of his political views. . . . The whole thing seems to me absurd. Neither men's mouths nor their purses can be constitutionally tied up in that way."

[32] Kaplan, Political Neutrality of the Civil Service, 1 Pub. Pers. Rev. 10; White, Civil Service in the Modern State (1930); Mosher and Kingsley, Public Personnel Administration (1936); White, Government Career Service (1935); Meriam, Public Personnel Problems (1938).

Military personnel is restricted in much the same manner. Army

viction that an actively partisan governmental personnel threatens good administration has deepened since *Ex parte Curtis.* Congress recognizes danger to the service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections.[33]

In *United States* v. *Wurzbach,* 280 U. S. 396, the doctrine of legislative power over actions of governmental officials was held valid when extended to members of Congress. The members of Congress were prohibited from receiving contributions for "any political purpose whatever" from any other federal employees. Private citizens were not affected. The argument of unconstitutionality because of interference with the political rights of a citizen by that time was dismissed in a sentence. Compare *United States* v. *Thayer,* 209 U. S. 39.

The provisions of § 9 of the Hatch Act and the Civil Service Rule 1 are not dissimilar in purpose from the statutes against political contributions of money. The prohibitions now under discussion are directed at political contributions of energy by government employees.

---

Regulations No. 600–10, p. 5: "6. Political activities of persons in military service.—*a. General.*—No member of the Army, while on active duty, will use his official authority or influence for the purpose of interfering with an election or affecting the course or outcome thereof. Such persons, while on active duty, retain the right to vote, to express their opinions privately and informally on all political subjects and candidates, and to become candidates for public office as permitted in these regulations. They will not be permitted to participate in any way in political management or political campaigns."

An interesting discussion of the general subject of interference by federal officers in elections will be found in the Appendix to the Congressional Globe, Dec. 3, 1838–Feb. 19, 1839, pp. 157, 160 and 409, 411.

[33] 86 Cong. Rec. 2338–2367, 2426–2442, 2696–2723, 2920–2963, 2969–2987, 9360–9380, 9426–9432, 9434–9463.

These contributions, too, have a long background of disapproval.[34]   Congress and the President are responsible for an efficient public service.   If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection.[35]

Another Congress may determine that, on the whole, limitations on active political management by federal personnel are unwise.   The teaching of experience has evidently led Congress to enact the Hatch Act provisions. To declare that the present supposed evils of political activity are beyond the power of Congress to redress would leave the nation impotent to deal with what many sincere men believe is a material threat to the democratic system. Congress is not politically naive or regardless of public welfare or that of the employees.   It leaves untouched full participation by employees in political decisions at the ballot box and forbids only the partisan activity of federal personnel deemed offensive to efficiency.   With that limitation only, employees may make their contributions to public affairs or protect their own interests, as before the passage of the Act.

---

[34] Richardson, Messages and Papers of the Presidents (1897), Harrison, vol. IV, p. 52; *id.*, Hayes, vol. VII, pp. 450–51.   See note 4, *supra*.

When in 1891 New Bedford, Mass., under a rule removed a policeman for political activity, an opinion by Mr. Justice, then Judge, Holmes disposed summarily of McAuliffe's contention that the rule invaded his right to express his political opinion with the epigram, "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe* v. *New Bedford*, 155 Mass. 216, 220, 29 N. E. 517.

[35] Several states have similar provisions.   Ala. Code (1940), Tit. 12, § 157; Conn. Gen. Stat. (Supp. 1939), c. 105a § 698e; Ohio Gen. Code (Page, 1937), § 486–23; Pa. Stat. Ann. (Purdon, 1942), Tit. 71, § 741.904; R. I. Acts & Resolves, 1939, p. 118.

The argument that political neutrality is not indispensable to a merit system for federal employees may be accepted. But because it is not indispensable does not mean that it is not desirable or permissible. Modern American politics involves organized political parties. Many classifications of government employees have been accustomed to work in politics—national, state and local—as a matter of principle or to assure their tenure. Congress may reasonably desire to limit party activity of federal employees so as to avoid a tendency toward a one-party system. It may have considered that parties would be more truly devoted to the public welfare if public servants were not overactive politically.

Appellants urge that federal employees are protected by the Bill of Rights and that Congress may not "enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work." None would deny such limitations on congressional power but, because there are some limitations, it does not follow that a prohibition against acting as ward leader or worker at the polls is invalid. A reading of the Act and Rule 1, notes 2 and 6, *supra,* together with the Commission's determination [36] shows the wide range of public activities with which there is no interference by the legislation. It is only partisan political activity that is interdicted. It is active participation in political management and political campaigns. Expressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted by law so long as the government employee does not direct his activities toward party success.

It is urged, however, that Congress has gone further

---

[36] United States Civil Service Commission, Political Activity and Political Assessments, Form 1236, January 1944.

than necessary in prohibiting political activity to all types of classified employees. It is pointed out by appellants "that the impartiality of many of these is a matter of complete indifference to the effective performance" of their duties.[37]  Mr. Poole would appear to be a good illustration for appellants' argument.  The complaint states that he is a roller in the mint.  We take it this is a job calling for the qualities of a skilled mechanic and that it does not involve contact with the public.  Nevertheless, if in free time he is engaged in political activity, Congress may have concluded that the activity may promote or retard his advancement or preferment with his superiors.  Congress may have thought that government employees are handy elements for leaders in political policy to use in building a political machine.  For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service.  There are hundreds of thousands of United States employees with positions no more influential upon policy determination than that of Mr. Poole.  Evidently what Congress feared was the cumulative effect on employee morale of political activity by all employees who could be induced to participate actively.  It does not seem to us an unconstitutional basis for legislation.

---

[37] "In the light of these wide variations in duties and responsibility for public policy and its fair enforcement, a restriction reasonably designed to preserve the impartiality of a Collector of the Revenue, a U. S. Marshal, an F. B. I. or Treasury agent may be utterly absurd and unjustified when applied to a lens grinder, a stock clerk, a machinist, or an elevator operator.  It is therefore impossible both to observe reasonable regard for constitutional rights and to enact sweeping prohibitions as to political rights applicable to all Federal employees whatever the nature of their duties.  In dealing with so complicated and varied a subject matter, a hatchet cannot readily be substituted for a scalpel."

There is a suggestion that administrative workers may be barred, constitutionally, from political management and political campaigns while the industrial workers may not be barred, constitutionally, without an act "narrowly and selectively drawn to define and punish the specific conduct." A ready answer, it seems to us, lies in the fact that the prohibition of § 9 (a) of the Hatch Act "applies without discrimination to all employees whether industrial or administrative" and that the Civil Service Rules, by § 15 made a part of the Hatch Act, makes clear that industrial workers are covered in the prohibition against political activity. Congress has determined that the presence of government employees, whether industrial or administrative, in the ranks of political party workers is bad. Whatever differences there may be between administrative employees of the government and industrial workers in its employ are differences in detail so far as the constitutional power under review is concerned. Whether there are such differences and what weight to attach to them, are all matters of detail for Congress. We do not know whether the number of federal employees will expand or contract; whether the need for regulation of their political activities will increase or diminish. The use of the constitutional power of regulation is for Congress, not for the courts.

We have said that Congress may regulate the political conduct of government employees "within reasonable limits," even though the regulation trenches to some extent upon unfettered political action. The determination of the extent to which political activities of governmental employees shall be regulated lies primarily with Congress. Courts will interfere only when such regulation passes beyond the generally existing conception of governmental power. That conception develops from practice, history, and changing educational, social and economic conditions. The regulation of such activities as Poole carried on has

the approval of long practice by the Commission, court decisions upon similar problems and a large body of informed public opinion. Congress and the administrative agencies have authority over the discipline and efficiency of the public service. When actions of civil servants in the judgment of Congress menace the integrity and the competency of the service, legislation to forestall such danger and adequate to maintain its usefulness is required. The Hatch Act is the answer of Congress to this need. We cannot say with such a background that these restrictions are unconstitutional.

Section 15 of the Hatch Act, note 3 above, defines an active part in political management or political campaigns as the same activities that the United States Civil Service Commission has determined to be prohibited to classified civil service employees by the provisions of the Civil Service Rules when § 15 took effect July 19, 1940. 54 Stat. 767. The activities of Mr. Poole, as ward executive committeeman and a worker at the polls, obviously fall within the prohibitions of § 9 of the Hatch Act against taking an active part in political management and political campaigns. They are also covered by the prior determinations of the Commission.[38] We need to examine no fur-

---

[38] United States Civil Service Commission, Political Activity and Political Assessments, Form 1236, September 1939:

"15. Committees.—Service on or for any political committee or similar organization is prohibited. . . .

.          .          .          .          .

"20. Activity at the polls and for candidates.— . . .

.          .          .          .          .

"It is the duty of an employee to avoid any offensive activity at primary and regular elections. He must refrain from soliciting votes, assisting voters to mark ballots, helping to get out the voters on registration and election days, acting as the accredited checker, watcher, or challenger of any party or faction, assisting in counting the vote, or engaging in any other activity at the polls except the marking and depositing of his own ballot."

ther at this time into the validity of the definition of political activity and § 15.[39]

The judgment of the District Court is accordingly

*Affirmed.*

MR. JUSTICE MURPHY and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE RUTLEDGE dissents as to Poole for the reasons stated by MR. JUSTICE BLACK. He does not pass upon the constitutional questions presented by the other appellants for the reason that he feels the controversy as to them is not yet appropriate for the discretionary exercise of declaratory judgment jurisdiction.

MR. JUSTICE FRANKFURTER, concurring.

The terms of the Act of August 24, 1937, 50 Stat. 751, 752, 28 U. S. C. § 380a, in the light of its history, have convinced me that this case should be dismissed for want of jurisdiction.

In that Act, Congress put a limit to the time within which a case may be docketed here after an appeal below is allowed. Such a limitation by Congress is in the exercise of its power to regulate the appellate jurisdiction of this Court. It is not within our power to enlarge a limit fixed by Congress unless Congress itself gave the Court such dispensing power.

In allowing a direct appeal to this Court from a district court "under such rules as may be prescribed," Congress did not mean to give this Court power to defeat the considerations of speed in the disposition of controversies involving the constitutionality of federal legislation which led to the specific provision that a case be docketed "within sixty days from the time such appeal is allowed."

---

[39] *United States* v. *Wurzbach*, 280 U. S. 396, 399.

No rule of this Court could disregard the limitations for perfecting an appeal made by Congress. Nor does Rule 47, which was the rule responsive to the Act of August 24, 1937, purport to do so. It merely reasserts the statutory requirement that in a case like this "The record shall be made up and the case docketed in this court within sixty days from the time the appeal is allowed." The introductory part of Rule 47, whereby the Rules of this Court regulating appellate procedure in other cases are adopted "as far as may be," has ample scope for operation without qualifying the necessity for speedy perfection of an appeal in cases involving constitutionality, so that the validity of acts of Congress may not remain in doubt through protracted litigation. This was a deep concern of Congress and its reason for imposing the sixty-day limitation for perfecting appeals in this class of cases.

But under compulsion of the Court's assumption of jurisdiction, I reach the merits and join in MR. JUSTICE REED's opinion.

MR. JUSTICE BLACK, dissenting.

The sentence in § 9 of the statute, here upheld, makes it unlawful for any person employed in the executive branch of the Federal Government, with minor numerical exceptions,[1] to "take any active part in political management or in political campaigns." The punishment pro-

---

[1] Those excepted are "a part-time officer or part-time employee without compensation or with nominal compensation serving in connection with the existing war effort," commonly designated as "Dollar-a-year men" and "(1) the President and Vice President of the United States; (2) persons whose compensation is paid from the appropriation for the office of the President; (3) heads and assistant heads of executive departments; (4) officers who are appointed by the President, by and with the advice and consent of the Senate, and who determine policies to be pursued by the United States in its relations with foreign powers or in the Nation-wide administration of Federal laws." § 9a; 18 U. S. C. 61h (a), as amended.

vided is immediate discharge and a permanent ban against reemployment in the same position.[2] The number of federal employees thus barred from political action is approximately three million. Section 12 of the same Act affects the participation in political campaigns of many thousands of state employees.[3] No one of all these millions of citizens can, without violating this law, "take any active part" in any campaign for a cause or for a candidate if the cause or candidate is "specifically identified with any National or State political party." Since under our com-

[2] "Any person violating the provisions of this section shall be immediately removed from the position or office held by him, and thereafter no part of the funds appropriated by any Act of Congress for such position or office shall be used to pay the compensation of such person." § 9b; 18 U. S. C. 61h (b).

[3] All state employees who work for any state agency financed in whole or in part by federal grants or loans are affected by the Act. Section 12a; 18 U. S. C. 61*l*.

In 1945 the Federal Government paid $865,729,569.15 in grants in aid to states, *Annual Report of the Secretary of the Treasury on the State of the Finances, for the fiscal year ended June 30, 1945 (1946)* 714, and $688,506,157.11 in direct payments to states for the social security program, public roads and emergency maternity and infant care. *Id.* at 718. Grants to and expenditures within states, providing direct relief, work relief, and other aid such as the Agricultural Adjustment Program, National Housing Agency annual contributions, etc., totaled $1,353,427,735.68. *Id.* at 721.

In July 1946 the number of persons employed by state and local governments totaled approximately 2,754,000 of whom 641,000 were employed in schools and 2,114,000 were non-school employees. *Public Employment in July, 1946, Government Employment,* Dept. of Commerce, Bureau of the Census, Vol. 7, No. 3 (1946) 1. A breakdown of county employees is a sample which suggests the proportion state and local whose salaries may be paid in whole or in part by federal funds thus coming under the provisions of this Act. Of a total of 310,000 non-school county employees in the entire country, 77,000 were employed in highway departments; 4,700 in natural resources; 12,600 in health and sanitation; 40,000 in hospitals; 22,000 in public welfare. *County Employment in 1944, Government Employment, op. cit. supra,* Vol. 5, No. 2 (1944) 7.

mon political practices most causes and candidates are espoused by political parties, the result is that, because they are paid out of the public treasury, all these citizens who engage in public work can take no really effective part in campaigns that may bring about changes in their lives, their fortunes, and their happiness.[4]

We are not left in doubt as to how numerous and varied are the "activities" prohibited. For § 15 sweepingly describes them as "the same activities . . . as the United States Civil Service Commission has heretofore determined are at the time this section takes effect prohibited on the part of employees in the classified civil service of the United States . . . ." Along with the vague and uncertain prior prohibitions of the Commission, are these things which the Commission had clearly prohibited: serving as an election officer; publicly expressing political views at a party caucus or political gathering for or against any candidate or cause identified with a party;

---

[4] There are minor exceptions. One concession only is granted those federal employees who live "in the immediate vicinity of the National Capital in the States of Maryland and Virginia or in municipalities the majority of whose voters are employed by the Government of the United States . . . ." The Civil Service Commission may "permit" them to participate in campaigns involving the "municipality or political subdivision" in which they reside "to the extent the Commission deems to be in [their] domestic interest . . . ." Section 16; 18 U. S. C. 61p. A general exception permits participation (1) in an "election and the preceding campaign if none of the candidates is to be nominated or elected . . . as representing a [political] party . . . (2) in connection with any question which is not specifically identified with any National or State political party. For the purposes of this section, questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character, shall not be deemed to be specifically identified with any National or State political party." § 18, 18 U. S. C. § 61r. The importance and number of political issues thus excepted, e. g. Sunday movies, local school bond issues, location of local parks, election of local officials in whom no political party is interested, are obviously very small.

soliciting votes for a party or candidate; participating in a political parade; writing for publication or publishing any letter or article, signed or unsigned, in favor of or against any political party, candidate, or faction; initiating, or canvassing for signatures on, community petitions or petitions to Congress.

In view of these prohibitions, it is little consolation to employees that the Act contradictorily says that they may "express their opinions on all political subjects and candidates." For this permission to "express their opinions" is, the Commission has rightly said, "subject to the prohibition that employees may not take any active part in . . . political campaigns." The hopeless contradiction between this privilege of an employee to talk and the prohibition against his talking stands out in the Commission's further warning to all employees that they can express their opinions publicly, but "Public expression of opinion in such a way as to constitute taking an active part in political management or in political campaigns is accordingly prohibited." Thus, whatever opinions employees may dare to express, even secretly, must be at their peril. They cannot know what particular expressions may be reported to the Commission and held by it to be a sufficient political activity to cost them their jobs. Their peril is all the greater because of another warning by the Commission that "Employees are . . . accountable for political activity by persons other than themselves, including wives or husbands, if, in fact, the employees are thus accomplishing by collusion and indirection what they may not lawfully do directly and openly." Thus are the families of public employees stripped of their freedom of political action. The result is that the sum of political privilege left to government and state employees, and their families, to take part in political campaigns seems to be this: They may vote in silence; they may carefully and quietly express a political view at

their peril; and they may become "spectators" (this is the Commission's word) at campaign gatherings, though it may be highly dangerous for them to "second a motion" or let it be known that they agree or disagree with a speaker.

All of the petitioners here challenge the constitutional validity of that sentence of § 9 of the statute which prohibits all federal employees from taking "any active part in political management or in political campaigns" and which by reference only sweeps under this prohibition all then-existing civil service regulations. The charge is that this provision, thus supplemented by the regulations, violates the First Amendment by prohibiting freedom of press, speech, and assembly; that it violates the Fifth Amendment because it effects an arbitrary and gross discrimination between government employees covered and those exempted; that it also violates the Fifth Amendment because it is so vague and indefinite as to prohibit lawful activities as well as activities which are properly made unlawful by other provisions of law. Thus, these attacks of Poole and all the other petitioners are identical, namely, that the provision is unconstitutional on its face. The Court decides this question against Poole after holding that his case presents a justiciable controversy. I think Poole's challenge to the constitutionality of the provision should be sustained. And since I agree with Mr. Justice Douglas that all the petitioners' complaints state a case or controversy, and show threats of imminent irreparable damages, I think that the contention that the challenged provision is unconstitutional on its face should be sustained as to all of them.

Had this measure deprived five million farmers or a million businessmen of all right to participate in elections, because Congress thought that federal farm or business subsidies might prompt some of them to exercise, or be susceptible to, a corrupting influence on politics or gov-

ernment, I would not sustain such an Act on the ground that it could be interpreted so as to apply only to some of them. Certainly laws which restrict the liberties guaranteed by the First Amendment should be narrowly drawn to meet the evil aimed at and to affect only the minimum number of people imperatively necessary to prevent a grave and imminent danger to the public.[5] Furthermore, what federal employees can or cannot do, consistently with the various civil service regulations, rules, warnings, etc., is a matter of so great uncertainty that no person can even make an intelligent guess. This was demonstrated by the government's briefs and oral arguments in this case. I would hold that the provision here attacked is too broad, ambiguous, and uncertain in its consequences to be made the basis of removing deserving employees from their jobs. See dissenting opinion, *Williams* v. *North Carolina,* 325 U. S. 226, 261, 276–278 and cases collected, note 16.

The right to vote and privately to express an opinion on political matters, important though they be, are but parts of the broad freedoms which our Constitution has provided as the bulwark of our free political institutions. Popular government, to be effective, must permit and encourage much wider political activity by all the people.[6] Real popular government means "that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion . . . Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political

---

[5] *Thornhill* v. *Alabama,* 310 U. S. 88; *Marsh* v. *Alabama,* 326 U. S. 501; *Bridges* v. *California,* 314 U. S. 252, 260, 263.

[6] Some states require that employers pay their employees for the time they spend away from work while voting. See *People* v. *Ford Motor Co.,* 271 App. Div. 141, 63 N. Y. S. 2d 697; Note, *Pay While Voting,* 47 Col. L. Rev. 135 (1947).

and economic truth." *Thornhill* v. *Alabama,* 310 U. S. 88, 95. Legislation which muzzles several million citizens threatens popular government, not only because it injures the individuals muzzled, but also because of its harmful effect on the body politic in depriving it of the political participation and interest of such a large segment of our citizens. Forcing public employees to contribute money and influence can well be proscribed in the interest of "clean politics" and public administration. But I think the Constitution prohibits legislation which prevents millions of citizens from contributing their arguments, complaints, and suggestions to the political debates which are the essence of our democracy; prevents them from engaging in organizational activity to urge others to vote and take an interest in political affairs; bars them from performing the interested citizen's duty of insuring that his and his fellow citizens' votes are counted. Such drastic limitations on the right of all the people to express political opinions and take political action would be inconsistent with the First Amendment's guaranty of freedom of speech, press, assembly, and petition. And it would violate, or come dangerously close to violating, Article I and the Seventeenth Amendment of the Constitution, which protect the right of the people to vote for their Congressmen and their United States Senators and to have their votes counted. See *Ex parte Yarbrough,* 110 U. S. 651; *United States* v. *Mosley,* 238 U. S. 383; *United States* v. *Classic,* 313 U. S. 299, 314.

There is nothing about federal and state employees as a class which justifies depriving them or society of the benefits of their participation in public affairs. They, like other citizens, pay taxes and serve their country in peace and in war. The taxes they pay and the wars in which they fight are determined by the elected spokesmen of all the people. They come from the same homes, communities, schools, churches, and colleges as do the other

citizens. I think the Constitution guarantees to them the same right that other groups of good citizens have to engage in activities which decide who their elected representatives shall be.

No statute of Congress has ever before attempted so drastically to stifle the spoken and written political utterances and lawful political activities of federal and state employees as a class. The nearest approach was the Civil Service Act of 1883, 22 Stat. 403–4, which authorized the President to promulgate rules so that, among other things, no government employee should "use his official authority or influence to coerce the political action of any person or body." In 1907, the Civil Service Commission, purporting to act under authority of the 1883 Act, did, as the Court points out, prohibit civil service employees from taking "an active part in political management or in political campaigns." But this Court has not approved the statutory power of the Commission to promulgate such a rule, nor has it ever expressly or by implication approved the constitutional validity of any such sweeping abridgement of the right of freedom of expression. Neither *Ex parte Curtis,* 106 U. S. 371, nor *United States* v. *Wurzbach,* 280 U. S. 396, lend the slightest support to the present statute. Both of these cases related to statutes which did no more than limit the right of employees to collect money from other employees for political purposes. Indeed, the *Curtis* decision seems implicitly to have rested on the assumption that many political activities of government employees, beyond merely voting and speaking secretly, would not, and could not under the Constitution, be impaired by the legislation there at issue. *Ex parte Curtis, supra,* at 375.

It is argued that it is in the interest of clean politics to suppress political activities of federal and state employees. It would hardly seem to be imperative to muzzle millions

of citizens because some of them, if left their constitutional freedoms, might corrupt the political process. All political corruption is not traceable to state and federal employees. Therefore, it is possible that other groups may later be compelled to sacrifice their right to participate in political activities for the protection of the purity of the Government of which they are a part.

It may be true, as contended, that some higher employees, unless restrained, might coerce their subordinates or that government employees might use their official position to coerce other citizens. But is such a possibility of coercion of a subordinate by his employer limited to governmental employer-employee relationships?[7] The same quality of argument would support a law to suppress the political freedom of all employees of private employers, and particularly of employers who borrow money or draw subsidies from the Government. Nor does it seem plausible that all of the millions of public employees whose rights to free expression are here stifled might, if they participate in elections, coerce other citizens not employed by the Government or the States. Poole, one of the petitioners here, is a roller in a United States mint. His job is about on a par in terms of political influence with that of most other state, federal, and private business employees. Such jobs generally do not give such employees who hold them sufficient authority to enable them to wield a dangerous or coercive influence on the political world. If the possibility exists that some other public employees may, by reason of their more influential positions, coerce other public employees or other citizens, laws can be drawn to punish the coercers.[8] It hardly seems consistent with

---

[7] Many states have laws protecting non-government employees from employer interference with their voting independence. See Note, *Pay While Voting*, 47 Col. L. Rev. 135, 136, note 9 (1947).

[8] See note 7, *supra*.

our system of equal justice to all to suppress the political and speaking freedom of millions of good citizens because a few bad citizens might engage in coercion.[9]

It may also be true, as contended, that if public employees are permitted to exercise a full freedom to express their views in political campaigns, some public officials will discharge some employees and grant promotion to others on a political rather than on a merit basis. For the same reasons other public officials, occupying positions of influence, may use their influence to have their own political supporters appointed or promoted. But here again, if the practice of making discharges, promotions or recommendations for promotions on a political basis is so great an evil as to require legislation, the law could punish those public officials who engage in the practice. To punish millions of employees and to deprive the nation of their contribution to public affairs, in order to remove temptation from a proportionately small number of public officials, seems at the least to be a novel method of suppressing what is thought to be an evil practice.

Our political system, different from many others, rests on the foundation of a belief in rule by the people—not some, but all the people. Education has been fostered better to fit people for self-expression and good citizenship. In a country whose people elect their leaders and decide great public issues, the voice of none should be suppressed—at least such is the assumption of the First Amendment. That Amendment, unless I misunderstand its meaning, includes a command that the Government must, in order to promote its own interest, leave the people at liberty to speak their own thoughts about government, advocate their own favored governmental causes, and work for their own political candidates and parties.

---

[9] The Act, in fact, leaves free the higher officials whose positions give them the actual power to coerce subordinates and other citizens not employed by the Government. § 9a; 18 U. S. C. 61h.

The section of the Act here held valid reduces the constitutionally protected liberty of several million citizens to less than a shadow of its substance. It relegates millions of federal, state, and municipal employees to the role of mere spectators of events upon which hinge the safety and welfare of all the people, including public employees. It removes a sizable proportion of our electorate from full participation in affairs destined to mould the fortunes of the nation. It makes honest participation in essential political activities an offense punishable by proscription from public employment. It endows a governmental board with the awesome power to censor the thoughts, expressions, and activities of law-abiding citizens in the field of free expression, from which no person should be barred by a government which boasts that it is a government of, for, and by the people—all the people. Laudable as its purpose may be, it seems to me to hack at the roots of a Government by the people themselves; and consequently I cannot agree to sustain its validity.

MR. JUSTICE DOUGLAS, dissenting in part.

I disagree with the Court on two of the four matters decided.

*First.* There are twelve individual appellants here asking for an adjudication of their rights.[1] The Court passes on the claim of only one of them, Poole. It declines to pass on the claims of the other eleven on the ground that

---

[1] Elkin, Senior Economic Statistician, Railroad Retirement Board; Abelson, Associate Financial Analyst, Social Security Board; Phillips, Labor Economist, War Shipping Administration; Mitchell, Wage Analyst, National War Labor Board; Fagan, Area Director, War Manpower Commission; Winegar, Senior Officer, Bureau of Prisons; Hindin, Procedural Assistant, Federal Security Agency; Rieck, Stock Clerk, Veterans Administration; Poole, Roller, United States Mint; Shane, Lens Grinder, Frankford Arsenal; Weber, Machinist Specialist, Frankford Arsenal; Tempest, Electric Welder, Philadelphia Navy Yard.

they do not present justiciable cases or controversies. With this conclusion I cannot agree.

It is clear that the declaratory judgment procedure is available in the federal courts only in cases involving actual controversies and may not be used to obtain an advisory opinion in a controversy not yet arisen. *Coffman* v. *Breeze Corporations,* 323 U. S. 316, 324–325, and cases cited. The requirement of an "actual controversy," which is written into the statute (Judicial Code § 274d, 28 U. S. C. § 400) and has its roots in the Constitution (Article III, § 2), seems to me to be fully met here.

What these appellants propose to do is plain enough. If they do what they propose to do, it is clear that they will be discharged from their positions. The analysis of the situation by the District Court seems to me to be accurate and conclusive:

"The mere existence of the statute, saying that they shall not engage in political activity, the penalty in the statute that they shall be dismissed if they do, and the warning addressed to them by the Civil Service Commission in their posters certainly prevent them from engaging in such activity, if the statute is constitutional. If the statute is unconstitutional, they are being prevented from things which they have the right to do. If the statute is constitutional, it is mandatory that they be dismissed for doing such things. . . . The provisions of Civil Service Rule XV that in case of any violation of the Civil Service Act or Rules or of any Executive Order or any regulation of the Commission the Commission shall certify the facts to the proper appointing officer with specific instructions as to discipline or dismissal is now controlled by the provisions of the Hatch Act that in case of violation of Section 9 (a) of that Act, dismissal is mandatory." 56 F. Supp. 621, 624.

Their proposed conduct is sufficiently specific to show plainly that it will violate the Act. The policy of the Commission and the mandate of the Act leave no lingering doubt as to the consequences.[2]

On a discharge these employees would lose their jobs, their seniority, and other civil service benefits. They could, of course, sue in the Court of Claims. *United States* v. *Lovett*, 328 U. S. 303. But the remedy there is a money judgment, not a restoration to the office formerly held. Of course, there might be other remedies available in these situations to determine their rights to the offices from which they are discharged. See *White* v. *Berry*, 171 U. S. 366, 377. But to require these employees first to suffer the hardship of a discharge is not only to make them incur a penalty; it makes inadequate, if not wholly illusory, any legal remedy which they may have.[3] Men who must sacrifice their means of livelihood in order to test their rights to their jobs must either pursue prolonged and expensive litigation as unemployed persons or pull up their roots, change their life careers, and seek employment in other fields. At least to the average person in the lower income groups the burden of taking that course

---

[2] The case is, therefore, unlike those situations where the Court refused to entertain actions for declaratory judgments, the state of facts being hypothetical in the sense that the challenge was to statutes which had not as yet been construed or their specific application known. See *Electric Bond & S. Co.* v. *Securities and Exchange Commission,* 303 U. S. 419, 443; *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450.

[3] Where the legal remedy is adequate, it may be the more appropriate one. Thus in *Coffman* v. *Breeze Corporations, supra,* declaratory relief was denied a licensor of a patent who sued his licensee for an adjudication that the Royalty Adjustment Act was unconstitutional since it appeared that a suit to recover royalties was an adequate legal remedy and that the constitutional issues could be litigated there.

is irreparable injury,[4] cf. *Ex parte Young,* 209 U. S. 123, 165, no matter how exact the required showing. Cf. *Watson* v. *Buck,* 313 U. S. 387, 400.

The declaratory judgment procedure may not, of course, be used as a substitute for other equitable remedies to defeat a legislative policy, *Great Lakes Co.* v. *Huffman,* 319 U. S. 293, 300–301, or to circumvent the necessity of exhausting administrative remedies. *Order of Conductors* v. *Penn. R. Co.,* 323 U. S. 166; *Macauley* v. *Waterman S. S. Corp.,* 327 U. S. 540. But it fills a need and serves a high function previously "performed rather clumsily by our equitable proceedings and inadequately by the law courts." H. R. Rep. No. 1264, 73d Cong., 2d Sess., p. 2.[5]

---

[4] If the prayer for declaratory relief be considered separately from the prayer for an injunction, as it may be, allegations of irreparable injury threatened are not required. *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 241.

[5] As stated in the Senate Report:

"The procedure has been especially useful in avoiding the necessity, now so often present, of having to act at one's peril or to act on one's own interpretation of his rights, or abandon one's rights because of a fear of incurring damages. So now it is often necessary, in the absence of the declaratory judgment procedure, to violate or purport to violate a statute in order to obtain a judicial determination of its meaning or validity . . . So now it is often necessary to break a contract or a lease, or act upon one's own interpretation of his rights when disputed, in order to present to the court a justifiable [sic] controversy. In jurisdictions having the declaratory judgment procedure, it is not necessary to bring about such social and economic waste and destruction in order to obtain a determination of one's rights . . . There seems little question that in many situations in the conduct of business serious disputes occur between parties, where, if there were a possibility of obtaining a judicial declaration of rights in a formal action, much economic waste could be avoided and social peace promoted. Persons now often have to act at their peril, a danger which could be frequently avoided by the ability to sue for a declaratory judgment as to their rights or duties." S. Rep. No. 1005, 73d Cong., 2d Sess., pp. 2–3. And see Borchard, Declaratory Judgments (2d ed.) p. 4.

The declaratory judgment procedure is designed "to declare rights and other legal relations of any interested party . . . whether or not further relief is or could be prayed." Judicial Code § 274d, 28 U. S. C. § 400. The fact that equity would not restrain a wrongful removal of an officeholder but would leave the complainant to his legal remedies, *White* v. *Berry, supra,* is, therefore, immaterial. A judgment which, without more, adjudicates the status of a person is permissible under the Declaratory Judgment Act. *Perkins* v. *Elg,* 307 U. S. 325, 349–350. The "declaration of a status was perhaps the earliest exercise of this procedure." H. R. Rep. No. 1264, 73d Cong., 2d Sess., p. 2. The right to hold an office or public position against such threats is a common example of its use.[6] Borchard, Declaratory Judgments (2d ed.), pp. 858 *et seq.* Declaratory relief is the singular remedy available here to preserve the *status quo* while the constitutional rights of these appellants to make these utterances and to engage in these activities are determined. The threat against them is real not fanciful, immediate not remote. The case is therefore an actual not a hypothetical one.[7]

---

[6] The case is therefore unlike one where the moving party shows no invasion of his legal rights but only possible injury to the public (*Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 125) or one where no judicial remedy for the alleged wrong has been created. *General Committee* v. *Missouri-K.-T. R. Co.,* 320 U. S. 323.

[7] The following are cases in which the Court has allowed actions for declaratory judgments to be entertained: *Aetna Life Ins. Co.* v. *Haworth, supra,* where an insured claimed and the insurance company denied that he had become totally and permanently disabled and hence was relieved of the obligation to continue the payment of premiums; *Currin* v. *Wallace,* 306 U. S. 1, where tobacco warehousemen and auctioneers claimed the Tobacco Inspection Act was unconstitutional; *Perkins* v. *Elg, supra,* where one claiming to be a citizen was threatened with deportation as an alien and had been declined a passport on the same ground; *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, where a third party was suing an insured and the insurer sought a judgment that it was not liable to defend

And the present case seems to me to be a good example of a situation where uncertainty, peril, and insecurity result from imminent and immediate threats to asserted rights.

Since the Court does not reach the constitutionality of the claims of these eleven individual appellants, a discussion of them would seem to be premature.

*Second.* Poole is not in the administrative category of civil service. He is an industrial worker—a roller in the mint, a skilled laborer or artisan whose work or functions in no way affect the policy of the agency nor involve relationships with the public. There is a marked difference in the British treatment of administrative and industrial employees under civil service.[8] And the difference between the two is for me relevant to the problem we have here.

---

the insured nor to indemnify the insured if the third party recovered; *Altvater* v. *Freeman,* 319 U. S. 359, where royalties were being demanded and paid under protest and by reason of an injunction; *Mercoid Corp.* v. *Honeywell Co.,* 320 U. S. 680, where an alleged patent infringer sought a declaration of the invalidity of the patent; *Tennessee Coal, I. & R. Co.* v. *Muscoda Local,* 321 U. S. 590, where an employer sued representatives of its employees for an adjudication of whether portal-to-portal pay was due under the Fair Labor Standards Act; *Hillsborough* v. *Cromwell,* 326 U. S. 620, where a taxpayer sued in the federal court to have assessments declared invalid on the ground that they violated the Federal Constitution, the state remedy being inadequate to protect the federal right; *Katzinger Co.* v. *Chicago Metallic Mfg. Co.,* 329 U. S. 394, where a licensee sought a declaration that he owed no royalties because of the invalidity of the patent; *Order of Railway Conductors* v. *Swan,* 329 U. S. 520, where it was sought to determine which division of the National Railroad Adjustment Board had jurisdiction over railroad yardmasters. Cf. *Railway Mail Assn.* v. *Corsi,* 326 U. S. 88, where a labor membership corporation, which did not admit negroes and was threatened with enforcement of a state statute declaring that practice of labor organizations unlawful, sued in a state court for an adjudication that the statute could not constitutionally be applied to it.

[8] Report, Committee on Parliamentary, etc., Candidature of Crown Servants (1925), pp. 12, 13.

The civil service system has been called "the one great political invention" of nineteenth century democracy.[9] The intricacies of modern government, the important and manifold tasks it performs, the skill and expertise required, the vast discretionary powers vested in the various agencies, and the impact of their work on individual claimants as well as on the general welfare have made the integrity, devotion, and skill of the men and women who compose the system a matter of deep concern of many thoughtful people.[10] Political fortunes of parties will ebb and flow; top policy men in administrations will come and go; new laws will be passed and old ones amended or repealed. But those who give continuity to administration, those who contribute the basic skill and efficiency to the daily work of government, and those on whom the new as well as the old administration is dependent for smooth functioning of the complicated machinery of modern government are the core of the civil service. If they are beneficiaries of political patronage rather than professional careerists, serious results might follow—or so Congress could reasonably believe. Public confidence in the objectivity and integrity of the civil service system might be so weakened as to jeopardize the effectiveness of administrative government. Or it might founder on the rocks of incompetency, if every change in political fortunes turned out the incumbents, broke the continuity of administration, and thus interfered with the development of expert man-

---

[9] Wallas, Human Nature in Politics (2d ed.), p. 263.

[10] Fish, The Civil Service and The Patronage (1905); Meriam, Public Personnel Problems (1938), ch. XI; Mosher & Kingsley, Public Personnel Administration (1941), ch. XVIII; Kingsley, Representative Bureaucracy (1944), ch. X; Morstein Marx, Public Management in the New Democracy (1940), ch. XIV; Field, Civil Service Law (1939), p. 196; Dawson, The Principle of Official Independence (1922), pp. 90 et seq.; Kaplan, Political Neutrality of the Civil Service, 1 Public Personnel Rev. 10; Chen, The Doctrine of Civil Service Neutrality in Party Conflicts in the United States and Great Britain (1937).

agement at the technical levels. Or if the incumbents were political adventurers or party workers, partisanship might color or corrupt the processes of administration of law with which most of the administrative agencies are entrusted.

The philosophy is to develop a civil service which can and will serve loyally and equally well any political party which comes into power.[11]

Those considerations might well apply to the entire group of civil servants in the administrative category—whether they are those in the so-called expert classification or are clerks, stenographers and the like. They are the ones who have access to the files, who meet the public, who arrange appointments, who prepare the basic data on which policy decisions are made. Each may be a tributary, though perhaps a small one, to the main stream which we call policy making or administrative action. If the element of partisanship enters into the official activities of any member of the group, it may have its repercussions or effect throughout the administrative process. Thus in that type of case there would be much to support the view of the Court that Congress need not undertake to draw the line to include only the more important offices but can take the precaution of protecting the whole by insulating even the lowest echelon from partisan activities.

So, I think that if the issues tendered by Poole were tendered by an administrative employee, we would have quite a different case. For Poole claims the right to work as a ward executive committeeman, *i. e.,* as an officeholder in a political party.

But Poole, being an industrial worker, is as remote from contact with the public or from policy making or from the functioning of the administrative process as a charwoman.

---

[11] See Chen, *op. cit. supra* note 10, ch. I; Report of President's Committee on Civil Service Improvement, H. Doc. No. 118, 77th Cong., 1st Sess., ch. III.

The fact that he is in the classified civil service is not, I think, relevant to the question of the degree to which his political activities may be curtailed. He is in a position not essentially different from one who works in the machine shop of a railroad or steamship which the Government runs, or who rolls aluminum in a manufacturing plant which the Government owns and operates. Can all of those categories of industrial employees constitutionally be insulated from American political life? If at some future time it should come to pass in this country, as it has in England, that a broad policy of state ownership of basic industries is inaugurated, does this decision mean that all of the hundreds of thousands of industrial workers affected could be debarred from the normal political activity which is one of our valued traditions?

The evils of the "spoils" system do not, of course, end with the administrative group of civil servants. History shows that the political regimentation of government industrial workers produces its own crop of abuses. Those in top policy posts or others in supervisory positions might seek to knit the industrial workers in civil service into a political machine. As a weapon they might seek to make the advancement of industrial workers dependent on political loyalty, on financial contributions, or on other partisan efforts. Or political activities of these workers might take place on government premises, on government time, or otherwise at government expense. These are specific evils which would require a specific treatment.

There is, however, no showing of any such abuse here. What Poole did, he did on his own without compulsion or suggestion or invitation from any one higher up. Nor does it appear that what he did was done on government time or on government premises. Moreover, as MR. JUSTICE BLACK points out, laws can be drawn to punish those who use such coercion. See *Ex parte Curtis*, 106 U. S. 371. Such activity is more than the exercise of

political prerogatives; it is the use of official power as well, and hence can be restrained or punished. Cf. *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, 776–777; *Thomas* v. *Collins,* 323 U. S. 516, 543–544.

The question is whether a permissible remedy is complete or partial political sterilization of the industrial group. There is, of course, the possibility of the mobilization, whether voluntary or otherwise, of millions of employees of the Federal Government and federally assisted state agencies for the purpose of maintaining a particular party or group in power. The marked increase in the number of government employees in recent years has accentuated the problem. The difficulty lies in attempting to preserve our democratic way of life by measures which deprive a large segment of the population of all political rights except the right to vote. Absent coercion, improper use of government position or government funds, or neglect or inefficiency in the performance of duty, federal employees have the same rights as other citizens under the Constitution. They are not second-class citizens. If, in the exercise of their rights, they find common political interests and join with each other or other groups in what they conceive to be their interests or the interests of the nation, they are simply doing what any other group might do. In other situations where the balance was between constitutional rights of individuals and a community interest which sought to qualify those rights, we have insisted that the statute be "narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest" of government. *Cantwell* v. *Connecticut,* 310 U. S. 296, 311. And see *Murdock* v. *Pennsylvania,* 319 U. S. 105, 116; *Thornhill* v. *Alabama,* 310 U. S. 88, 104–105.

That seems to me the proper course to follow here. The prohibition in § 9 (a) of the Hatch Act against government employees taking an "active part in political man-

agement or in political campaigns" applies without discrimination to all employees whether industrial or administrative. The same is true of the Civil Service Rules. See Rules I, § 1, XV, 5 C. F. R. Cum. Supp., §§ 1.1, 15.1. But the supposed evils are both different and narrower in case of industrial workers than they are in the case of the administrative group.[12] The public interest in the political activity of a machinist or elevator operator or charwoman is a distinct and different problem.[13] In those cases the public concern is in the preservation of an unregimented industrial group, in a group free from political pressures of superiors who use their official power for a partisan purpose. Then official power is misused,

[12] See Morstein Marx, *op. cit.*, *supra*, note 10, pp. 205–206; Report of the Committee on Parliamentary, etc., Candidature of Crown Servants, *supra*, note 8, p. 32; Finer, The British Civil Service (1937), pp. 203–204.

[13] As stated in Morstein Marx, *op. cit.*, *supra*, note 10, pp. 205–206:

"The political neutrality of a postal clerk, of a conductor on the city-owned subway system in New York, of a technician in the Chicago sanitary district, or of an artisan in the labor class, does not have the same significance as the political neutrality of the prominent section chiefs of the Department of State or the political neutrality of an assistant to a commissioner in a New York City department. No discussion of the problem which ignores the *differences between categories of employees* is anything but an academic consideration of the problem. Top officialdom has such marked opportunities of shaping policy that its political behavior must be so neutral as to raise no question of a divergence in point of view between it and the executive officers of government. It is quite proper, therefore, to require the most impeccable political neutrality from such officials. But the average or typical civil servant has no more opportunity in the sphere of policy making than does the average citizen. He is entrusted with a function ministerial in nature, a routine task almost wholly unaffected by his political point of view. This principle is recognized in the English rule that industrial workers in government employment may stand for election, a privilege denied administrative employees."

perverted. The Government is corrupted by making its industrial workers political captives, victims of bureaucratic power, agents for perpetuating one party in power.

Offset against that public concern are the interests of the employees in the exercise of cherished constitutional rights. The nature and importance of those rights have been fully expounded in MR. JUSTICE BLACK's opinion. If those rights are to be qualified by the larger requirements of modern democratic government, the restrictions should be narrowly and selectively drawn to define and punish the specific conduct which constitutes a clear and present danger to the operations of government. It seems plain to me that that evil has its roots in the coercive activity of those in the hierarchy who have the power to regiment the industrial group or who undertake to do so. To sacrifice the political rights of the industrial workers goes far beyond any demonstrated or demonstrable need. Those rights are too basic and fundamental in our democratic political society to be sacrificed or qualified for anything short of a clear and present danger to the civil service system. No such showing has been made in the case of these industrial workers [14] which justifies their political sterilization as distinguished from selective measures aimed at the coercive practices on which the spoils system feeds.

---

[14] Whether the Act, being unconstitutional as applied to Poole, could be separably applied to civil service employees in other categories is a question I do not reach.