# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00475-CV

**Texans Uniting for Reform and Freedom, Appellant**

**v.**

**Amadeo Saenz, Jr., P.E., Individually and in his Official Capacity as Executive Director
of the Texas Department of Transportation; Coby Chase, Individually and in his
Official Capacity as Director of the Texas Department of Transportation Government
and Public Affairs Division; Texas Department of Transportation;
and Texas Transportation Commission, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-GN-07-003165, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

Texans Uniting for Reform and Freedom (TURF) appeals a district court judgment dismissing, on a plea to the jurisdiction, its suit against appellees Amadeo Saenz, Jr., P.E., individually and in his official capacity as Executive Director of the Texas Department of Transportation; Coby Chase, individually and in his official capacity as Director of the Texas Department of Transportation Government and Public Affairs Division; the Texas Department of Transportation (TxDOT); and the Texas Transportation Commission (Commission). In two issues, TURF argues that the district court (1) erred in granting appellees' plea and (2) abused its discretion in denying it a continuance and adjudicating appellees' "merits-based" plea through

preliminary proceedings rather than trial. For the reasons explained below, we will overrule these contentions and affirm the district court's judgment.

## BACKGROUND

Within the last decade, the Texas Legislature has enacted significant changes to the manner in which Texas's transportation infrastructure is financed, constructed, and maintained. Among these enactments have been legislation authorizing the Commission to designate a statewide system of highways, toll roads, and other modes of transportation facilities known as the "Trans-Texas Corridor" (TTC);[1] empowering TxDOT to develop and operate TTC facilities either directly or through the participation of governmental or private entities (with private participation to be encouraged "[t]o the maximum extent practical and economical");[2] and expanding the agency's power to toll both new and existing state highway infrastructure.[3] However, as TxDOT and the Commission proceeded with steps to make these sorts of projects a reality, issues related to the tolling of new or existing roads and the TTC concept proved to be controversial.

Particularly controversial were TxDOT's plans to build two TTC projects—TTC-35, which would run roughly parallel to current Interstate 35, and TTC-69, which would run roughly parallel to current U.S. Highway 59. Simply described, the planning process for each project included, among other steps, several rounds of public meetings or hearings to elicit public input concerning whether the project should be built in particular areas and the viability of alternative

---

[1] *See generally* Tex. Transp. Code Ann. §§ 227.001-083 (West Supp. 2009).

[2] *See id.* §§ 227.021-.023.

[3] *See generally id.* §§ 228.001-254 (West Supp. 2009).

2

potential routes. The process would culminate in either a "no-build option" or a "tier one" environmental-impact statement concerning a several mile-wide "preferred corridor," which would be submitted for approval by the Federal Highway Administration. Assuming the project proceeded through "tier one," the process would essentially be repeated in a "tier 2" in which the environmental impact of specific routes and transportation facilities would be assessed.

As this process continued, in the latter half of 2006 TxDOT hired a marketing firm to provide creative services, media placement, and website development for what appellees term "a statewide public information effort to inform and educate the public about meeting Texas' transportation needs." In June 2007, an advertising campaign—with the slogan "Keep Texas Moving"—was launched, with television, radio, print, billboard, and internet advertisements that emphasized what were portrayed as the need for and benefits of toll projects and the TTC concept.[4] While some advertising ran statewide, the campaign was focused on cities in or near the TTC-69 study area, and to some extent, major cities along the TTC-35 study area.

Also, in January 2007, TxDOT contracted with a public affairs consulting firm, the Rodman Company, to provide communications and outreach concerning the TTC to various specific audiences at the local, state, and federal levels, including local officials. Among the stated goals of Rodman's "Texas Outreach" work plan were "to identify highly targeted leadership audiences and communicate with them directly to improve their understanding of TxDOT's goals and strategies, and increase support for TxDOT programs—particularly the Trans-Texas Corridor and tolling." Rodman was also to provide "Federal Outreach" to "educate audiences about issues of importance

---

[4] The visual materials featured a "Keep Texas Moving" logo.

to [TxDOT] and the successful implementation of TxDOT's federal legislative agenda." Rodman also assisted with planning and organizing for TxDOT a series of "town hall" meetings along the TTC-69 corridor.

Appellant TURF describes itself as "a non-profit organization whose mission is to educate the public about the Texas government's new shift to tolling using controversial financing called public-private partnerships[,]. . . the tolling of existing corridors, . . . the eminent domain abuse inherent in these claims (confiscating private land to give to a private company for commercial gain)," and the TTC. TURF adds that it is "a grassroots group of taxpaying Texans who are asking for reforms that require accountability and good public policy as well as promoting non-toll, sensible transportation solutions." In September 2007, TURF's founder and director, Terri Hall, filed an original petition seeking injunctive and declaratory relief to restrain, as illegal, TxDOT's expenditures of public funds on the KTM campaign or "lobbying" of governmental units concerning toll roads or TTC projects. Named as defendants were TxDOT's then-executive director and appellee Chase. The defendants responded with a plea to the jurisdiction asserting, among other grounds, sovereign immunity and lack of standing. Multiple rounds of amendments to the pleadings and pleas to the jurisdiction followed. Ultimately, TURF proceeded as the sole plaintiff, naming appellees Saenz, Chase, TxDOT, and the Commission as defendants.

A hearing on the defendants' plea to the jurisdiction was initially set for October 18, 2007. On that day, the district court granted TURF a ninety-day continuance. The hearing was ultimately reset for March 20, 2008. During the interim, the parties conducted discovery, including

4

depositions of Saenz, Chase, and other TxDOT employees. Both parties filed discovery products, affidavits, and other evidence in connection with the pending plea.

On the morning of March 20, 2008, prior to the hearing, TURF filed an amended petition (which also incorporated its evidence by reference) and another motion for continuance seeking additional time for discovery. The district court took the continuance motion under advisement and proceeded with the hearing. At the hearing's conclusion, the court also took the plea under advisement. Approximately two weeks after the hearing, TURF moved to supplement the record with additional documents.

The district court ultimately granted both TURF's motion to supplement the record and appellees' plea to the jurisdiction. It rendered judgment dismissing TURF's suit in its entirety. This appeal followed.

**ANALYSIS**

In two issues on appeal, TURF argues that the district court (1) erred in granting appellees' plea to the jurisdiction and (2) abused its discretion in denying it a continuance and adjudicating, at the pretrial stage, appellees' "merits-based" plea to the jurisdiction.

**Standard and scope of review**

A plea to the jurisdiction challenges a trial court's authority to decide a case. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). Analysis of whether this authority exists begins with the plaintiff's live pleadings. *Id.* at 226. The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to

5

hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Whether the plaintiff met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally, taking them as true, and look to the pleader's intent. *Id.*; *Texas Logos, L.P. v. Brinkmeyer*, 254 S.W.3d 644, 659 (Tex. App.—Austin 2008, no pet.). If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Miranda*, 133 S.W.3d at 226-27. If, on the other hand, the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 227.

When resolving issues presented by the plea to the jurisdiction, we may consider evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional issues. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). In fact, in a plea to the jurisdiction, a party may present evidence to negate the existence of a jurisdictional fact alleged in the pleadings, which we would otherwise presume to be true. *See Miranda*, 133 S.W.3d at 227. To the extent the challenge implicates the merits of the plaintiff's cause of action, the party asserting the plea has the burden of negating a genuine issue of material fact as to the jurisdictional fact's existence, in a manner similar to a traditional summary-judgment motion. *See id.* at 227-28. Whether the party meets this burden is a question of law that we review de novo. *Id.* at 228. If the pleading requirement has been met and the party challenging jurisdiction submits evidence that

6

implicates the merits of the pleader's cause of action, we take as true all evidence favorable to the pleader and indulge every reasonable inference and resolve any doubts in the pleader's favor. *Id.*[5]

To invoke the district court's subject-matter jurisdiction, a claimant must have the standing required by the state constitution. *See Texas Ass'n of Bus.*, 852 S.W.2d at 443-45. TURF claims associational standing to assert its claims on behalf of its members. To have standing to sue on its members' behalf, TURF must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.* at 445-46. At this juncture, the sole disputed element is whether TURF's members would have standing to sue in their own right.

To have standing to challenge a governmental action or assert a public right (the sort of claims TURF asserts on behalf of its members), a claimant generally must demonstrate that he has suffered a particularized injury distinct from that of the general public. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 555-56. However, there is a narrow exception to that rule—a taxpayer has standing to seek prospective injunctive or declaratory relief to restrain the illegal expenditure of public funds, even without showing a distinct injury. *See id.* at 556; *Hendee v. Dewhurst*, 228 S.W.3d 354, 373-74, 378-79 & n.31 (Tex. App.—Austin 2007, pet. denied). TURF relies on this exception as the basis for the individual standing of its members. Specifically, TURF asserts—and it appears undisputed on appeal—that its membership includes state taxpayers who would have individual

---

[5] A somewhat different standard applies when a challenge to a jurisdictional fact's existence does not implicate the merits. *See University of Tex. v. Poindexter*, 306 S.W.3d 798, 806 (Tex. App.—Austin 2009, no pet.).

standing to sue to restrain ongoing illegal state expenditures. Further, TURF insists, it has stated

claims that appellees are making "illegal expenditures" within the meaning of this exception.

Importantly, these principles confer standing on taxpayers only to assert claims

to restrain prospective governmental expenditures—money that has not yet been spent. *See*

*Bland Indep. Sch. Dist.*, 34 S.W.3d at 556-58. As long as the public money has not yet been spent,

the taxpayer is considered to have a justiciable interest in ensuring that the money not be spent

illegally. *See id.* at 556 ("'When a taxpayer brings an action to restrain the illegal expenditure . . .

of tax money he sues for himself, and it is held that his interest in the subject-matter is sufficient to

support the action . . . .'" (quoting *Hoffman v. Davis*, 100 S.W.2d 94, 95 (Tex. 1937))). However,

once the money has been spent, a cause of action based on the past expenditures belongs to the

taxing entity alone. *See id.* The Texas Supreme Court has also explained that this distinction rests

upon a balancing of taxpayers' interests in restraining illegal spending of their tax dollars with the

interest in avoiding disruption of governmental operations. *See id.* at 555-58.

Independent from the question of TURF's standing, but somewhat related to it, is

the issue of whether its claims are barred by sovereign immunity. Absent waiver by the legislature,

sovereign immunity generally deprives courts of subject-matter jurisdiction over suits against the

State, its agencies, or officers or employees acting within their official capacity. *See City of El Paso*

*v. Heinrich*, 284 S.W.3d 366, 369-76 (Tex. 2009). In its attempt to invoke the district court's

subject-matter jurisdiction, TURF relies on the "ultra vires" exception to sovereign immunity, which

permits a plaintiff to sue a state official in his official capacity (thereby binding the State through its

agent) for prospective injunctive or declaratory relief to restrain the official from violating statutory

8

or constitutional provisions. *See id.* at 372-73, 377. Sovereign immunity does not bar such suits because, in concept, acts of state officials that are not lawfully authorized are not considered to be acts of the State, and the remedy of compelling such officials to comply with the law, while binding on the State, "do[es] not attempt to exert control over the state [but] attempt[s] to reassert the control *of* the state." *Id.* at 372-73 (emphasis added).

To assert a valid ultra vires claim, the claimant "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* at 372. Otherwise, the suit, even if seeking only prospective declaratory or injunctive relief, implicates sovereign immunity because it seeks to control state action. *See id.* Additionally, even if the suit complains of ultra vires actions, the remedy sought cannot have the effect of awarding retrospective monetary relief against the State or other relief that would independently implicate sovereign immunity. *See id.* at 369-76; *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.).

As detailed below, TURF complains of the same acts as both "illegal expenditures" and "ultra vires" acts. With respect to both complaints, it is not enough that TURF pleads or argues legal conclusions that appellees are violating statutory provisions. Rather, TURF has the initial burden of alleging *facts* that affirmatively demonstrate the district court's subject-matter jurisdiction. *See Miranda*, 133 S.W.3d at 226. And "we construe the statutory . . . provisions that are implicated, apply them to the facts [TURF] has pled and that were not negated by evidence [per *Miranda*], and determine whether [TURF] has alleged acts that would constitute violations of the relevant . . .

9

statutory provisions." *Creedmoor-Maha Water Supply Corp.*, 307 S.W.3d at 516 (citing *Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n*, 600 S.W.2d 264, 265-70 (Tex. 1980); *Hendee*, 228 S.W.3d at 368-69)).

Before turning to this analysis, however, we observe that TURF's claims against some of the appellees are barred by sovereign immunity regardless of whether it has otherwise invoked the district court's subject-matter jurisdiction. The Texas Supreme Court has recently clarified that an ultra vires suit (1) must be asserted against a state official in his official capacity, and (2) even while the remedy binds the State and thus has the same practical effect as a judgment against the State itself, "the governmental entities themselves—as opposed to their officers in their official capacity—remain immune from suit." *See Heinrich*, 282 S.W.3d at 373. Thus, even assuming TURF has standing to assert its claims, it cannot, through reliance on the ultra vires exception, avoid the sovereign immunity of TxDOT and the Commission. Consequently, its claims against those appellees are barred unless the legislature has waived that immunity. TURF has not pled or otherwise demonstrated such a waiver with respect to its ultra vires claims against TxDOT and the Commission. Although TURF cites prior statements from this Court to the effect that the UDJA "waives" sovereign immunity with respect to an ultra vires suit, *Heinrich* and other recent Texas Supreme Court decisions have clarified that the UDJA's waiver is limited to suits challenging the validity of certain governmental ordinances or statutes. *See id.* at 373 & n.6; *accord Texas Dep't of Ins. v. Reconveyance Servs., Inc.*, 306 S.W.3d 256, 257-59 (Tex. 2010) (per curiam). Accordingly,

10

we hold, as an initial matter, that the district court did not err in dismissing TURF's claims against TxDOT and the Commission for want of subject-matter jurisdiction.[6]

This leaves Saenz and Chase, whom TURF has purported to sue in both their official and individual capacities. *Heinrich* again guides us in narrowing the parties and issues in dispute. In that case, the supreme court indicated that injunctive relief to control a governmental unit's spending would "necessarily" come from the governmental unit rather than individual members of its governing body, meaning that the plaintiff must sue an appropriate agent of the unit in his or her official capacity to obtain that relief. *See Heinrich*, 282 S.W.3d at 377. The same is true here. The remedy TURF seeks in its suit—restraining state spending—would lie against Saenz and Chase in their official rather than individual capacities. TURF's complaints on appeal are limited to challenging the dismissal of its claims seeking these remedies. To the extent TURF is complaining about the dismissal of its "individual" claims against Saenz and Chase, it has presented nothing for review. *See* Tex. R. App. P. 33.1.

We now turn to whether TURF invoked the district court's subject-matter jurisdiction to adjudicate its claims against Saenz and Chase in their official capacities (the "officials"). Specifically, we consider whether the facts TURF has alleged and that were not negated by evidence constitute violations of the statutory provisions on which TURF relies.

---

[6] In the alternative, TURF's claims against TxDOT and the Commission were properly dismissed for the same reasons that we affirm dismissal of TURF's claims against Saenz and Chase in their official capacity, discussed below.

11

**TURF's claims**

On appeal, TURF argues that it stated claims predicated on violations of three prohibitions in chapter 556 of the government code, as well as violations of the federal Hatch Act.

*Government code section 556.004*

TURF urges that it stated a claim that the officials are violating government code section 556.004. This section provides:

Sec. 556.004. PROHIBITED ACTS OF AGENCIES AND INDIVIDUALS.

(a)    A state agency may not use any money under its control, including appropriated money, to finance or otherwise support the candidacy of a person for an office in the legislative, executive, or judicial branch of state government or of the government of the United States. This prohibition extends to the direct or indirect employment of a person to perform an action described by this subsection.

(b)    A state officer or employee may not use a state-owned or state-leased motor vehicle for a purpose described by Subsection (a).

(c)    A state officer or employee may not use official authority or influence or permit the use of a program administered by the state agency of which the person is an officer or employee to interfere with or affect the result of an election or nomination of a candidate or to achieve any other political purpose.

(d)    A state employee may not coerce, attempt to coerce, command, restrict, attempt to restrict, or prevent the payment, loan, or contribution of any thing of value to a person or political organization for a political purpose.

(e)    For purposes of Subsection (c), a state officer or employee does not interfere with or affect the results of an election or nomination if the individual's conduct is permitted by a law relating to the individual's office or employment and is not otherwise unlawful.

Tex. Gov't Code Ann. § 556.004 (West 2004). A state employee who violates subsections (c) or (d) of section 556.004 is subject to immediate termination of employment, *see id.* § 556.007 (West 2004), and a state agency is prohibited from using appropriated funds to compensate such employees, state officers who violate subsection (c), or state officers or employees who violate subsections (a) or (b) of section 556.004. *See id.* § 556.008 (West 2004).

On appeal, TURF relies on subsection (c) of section 556.004. It asserts that the facts it alleged in its pleadings that were not conclusively negated by evidence demonstrate that the officials' "actions in spending public money on the 'Keep Texas Moving' campaign" constitute a prohibited use of their official authority or influence or the permitting of the use of a program they administer "to achieve [a] political purpose" within the meaning of this provision.[7] The parties' arguments on this point center on conclusory assertions that KTM advertisements and communications are "political" in nature, as TURF urges, versus merely "informational" or "educational," as the officials insist. To determine whether TURF has stated a claim for a violation of subsection (c), however, we must first determine what the legislature meant by "political purpose" in that provision.

Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory

---

[7] There is no dispute that each official is either a "state officer" or "state employee," and the distinction between the two statutory categories is not material to this case. *See* Tex. Gov't Code Ann. § 556.001(3), (4) (West 2004). Likewise, there is no dispute that TxDOT is a "state agency" under chapter 556. *See id.* § 556.001(2) (West 2004).

13

text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437; *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We should also read every word, phrase, and expression in a statute as if it were deliberately chosen, and likewise presume that words excluded from the statute are done so purposefully. *See Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Our analysis of the statutory text is also informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, and "common law or former statutory provisions, including laws on the same or similar subjects." *Id.* § 311.023(1)-(4) (West 2005). Similarly, we assume that when enacting a statute, the legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). However, only when

14

the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

Although the legislature used the term "political purpose" in both subsection (c) and (d) of section 556.004, it did not define the term anywhere in chapter 556. All other things being equal, the adjective "political," like its noun form, "politics," can have a range of meanings. In its most general sense, "politics" refers to the science of the organization or administration of government,[8] and "political" is that which relates to government or the conduct of government.[9] The legislature used "political" in this sense elsewhere in chapter 556—section 556.0055 regulates the use of state funds for "lobbying" by "political subdivisions." *See* Tex. Gov't Code Ann. § 556.0055 (West 2004). The terms also have narrower (and sometimes pejorative) connotations relating to the grappling between individuals and groups for power, leadership, and influence over government,

---

[8] *See Black's Law Dictionary* 1277 (9th ed. 2009) ("[t]he science of the organization and administration of the state"); *Webster's Ninth New Collegiate Dictionary* 911 (1984) ("the art or science of government"); *see also id.* ("the total complex of relations between people in society").

[9] *See Black's Law Dictionary* 1276 ("of or relating to the conduct of government"); *Webster's Ninth New Collegiate Dictionary* 910 (1984) ("of and relating to government, a government, or the conduct of government," "organized in governmental terms"); *see also Margraves v. State*, 56 S.W.3d 673, 687 & n.6 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (citing dictionary definition of "political" as "of or pertaining to public policy . . . relating to affairs of state or administration" in distinguishing "political" use of state aircraft from "personal" use); *Heidtman v. City of Shaker Heights*, 126 N.E.2d 138, 143 (Ohio 1955) (quoting dictionary definition of "politics" as "the branch of civics that treats of the principles of civil government and the conduct of state affairs; the administration of public affairs in the interest of peace, prosperity and safety of the state; statecraft; political science; in a wide sense embracing the science of government and civil polity").

especially through electoral or partisan competition.[10]  Additionally, a third set of definitions, somewhere in between the other two in their scope and generality, refers to the formulation and influencing of governmental policy, as distinguished from the administration of such policy.[11]

We can quickly conclude that the legislature did not intend to incorporate the first definition of "political" in subsection (c).  Assuming that meaning of "political" in subsection (c), the provision would prohibit state employees from using their official authority or influence or permitting the use of a state agency program to achieve a purpose related to government or the conduct of government.  The legislature could not possibly have intended to mandate governmental inaction, and we must reject such a construction.  *See T.C.R. v. Bell County Dist. Atty's Office*, 305 S.W.3d 661, 671-72 (Tex. App.—Austin 2009, no pet.) (discussing "absurd results" limitation on textual literalism, whereby we reject constructions that legislature could not possibly have intended); *see also* Tex. Gov't Code Ann. § 311.021(2), (3) (we are to presume that "the entire statute is intended to be effective" and that "a just and reasonable result is intended").  However, the remaining potential definitions and constructions require further analysis.  It is not inconceivable

---

[10] *See Black's Law Dictionary* 1277 ("politics" includes "[t]he activity or profession of engaging in political affairs"); *Webster's Ninth New Collegiate Dictionary* 910-11 (1984) ("politics" includes "the art or science concerned with winning and holding control over a government . . . competition between competing interest groups or individuals for power and leadership (as in a government) . . . political life esp. as a principal activity or profession . . . political activities characterized by artful and often dishonest practices . . . the political opinions or sympathies of a person" and "political" includes "of, relating to, or involving politics and esp. party politics"); *see also Heidtman*, 126 N.E.2d at 143 ("politics" includes "political affairs in a party sense; the administration of public affairs or the conduct of political matters so as to carry elections and secure public office; party intrigues; political wirepulling; trickery").

[11] *Webster's Ninth New Collegiate Dictionary* 911 ("politics" includes "the art or science concerned with guiding or influencing governmental policy" and "political" includes "of, relating to, or concerned with the making as distinguished from the administration of governmental policy").

16

that the legislature intended subsection (c) to prohibit state employees from using official authority or influence or permitting use of state programs to impact the formulation of broader public policy, as opposed to merely exercising delegated powers to implement and administer such policy. Alternatively, subsection (c) could have been intended to more narrowly prohibit state employees from using official authority and influence or permitting use of state programs to help particular individuals or groups gain power, leadership, and influence over government and the policymaking process through electoral or partisan competition.

We can obtain additional guidance regarding the meaning of "political purpose" from the structure of subsection (c). Within subsection (c), the legislature prohibited state officers and employees from using their official authority or influence or permitting state programs (1) to affect the result of an election; (2) to affect the nomination of a candidate; or (3) to achieve "any other political purpose." This usage demonstrates that the legislature considered the first two purposes (affecting election results or candidate nominations) to be "political purposes." Further, the fact that the legislature preceded the catch-all phrase "any other political purpose" with two specific examples of "political purposes" is also significant. Under the rule of ejusdem generis, when words of a general nature are used in connection with the designation of particular objects or things, we generally presume that the legislature intended to limit the general words to the same class or kinds as the specific examples. *See Hilco Elec. Coop. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003) ("[T]he rule of ejusdem generis . . . provides that when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation."); *Hightower v. State*

17

*Comm'r of Educ.*, 778 S.W.2d 595, 598 (Tex. Civ. App.—Austin 1989, no writ) (applying ejusdem generis in construing "other full-time professional employee" to be limited to jobs entailing same types of activities as specific job classifications that preceded it in statute); *see also Hilton v. Southwestern Bell Tel. Co.*, 936 F.2d 823, 828 (5th Cir. 1991) (per curiam) (ejusdem generis rule "is one of limitation, restricting general terms, such as 'any other' and 'and the like,' which follow specific terms, to matters similar to those specified"). Applying that guidepost here, it indicates that the legislature in subsection (c) viewed "political purposes" to mean purposes similar in kind or nature to achieving or aiding the nomination or election of candidates.[12]

Also instructive are subsection (c)'s historical origins. The statute that became government code chapter 556 was originally enacted in 1983. Act of May 28, 1983, 68th Leg., R.S., ch. 579, 1983 Tex. Gen. Laws 3763, 3763-65. As enacted, the statute's prohibitions included only those found in current subsections (c) and (d), as well as the language found in current subsection (e). *See id.* at § 3, 1983 Tex. Gen. Laws 3763, 3763-64.[13] These types of restrictions

---

[12] The legislature's use of "political purpose" in subsection (d) is not inconsistent with this construction. There, as previously noted, the legislature barred certain actions by state employees to influence other persons' contributions or loans of things of value "to a person or political organization for a political purpose." Tex. Gov't Code Ann. § 556.004(d) (West 2004). "Political organization," like "political purpose," is not defined. However, subsection (d) implies that acts in relation to a "political organization" are not in themselves "for a political purpose," as the provision's focus is limited to influencing contributions or loans of things of value "to a person or political organization *for a political purpose*."

[13] The prohibition against state agencies using appropriated money for legislative lobbying found in current section 556.006 (discussed below) did not appear until 1997, when it was added as part of a broader series of enactments related to state fiscal matters. *See* Act of May 28, 1997, 75th Leg., R.S., ch. 1035, § 86, sec. 556.006, 1997 Tex. Gen. Laws 3845, 3866-67. The limitations on use of state resources for supporting candidates for office contained in current subsections (a) and (b) of section 556.004, as well as current section 556.005's restrictions against state agencies employing lobbyists (discussed below) were added in a 1999 enactment intended to codify spending

18

have a long history in American law, dating back to as early as the Civil Service Act of 1883, also known as the Pendleton Act, in which Congress created a merit-based civil service, eschewing "the spoils system under which federal employees came and went, depending upon party service and changing administrations rather than meritorious performance." *See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 557-59 (1973) (summarizing this history). To prevent the former "mixing of partisan politics and routine federal service" from undermining the merit system, *id.*, Congress provided that "no person in the public service is for that reason under any obligations to contribute to any political fund, or to render any political service," and that "no person in said service has any right to use his official authority or influence to coerce the political action of any person of body." *Id.* at 558 (quoting Pendleton Act). Additional limitations on federal employees' political activities were subsequently imposed by rule, Civil Service Commission decisions, and statute, most prominently the Hatch Act, which was also extended to certain employees of state governmental entities that receive federal funds. *Letter Carriers*, 413 U.S. at 559-63; *see* 5 U.S.C. §§ 1501-08 (state and local employees), 7221-26 (federal employees). As the United States Supreme Court has observed, these limitations advanced the goals of ensuring that covered employees impartially execute the laws "without bias or favoritism for or against any political party or group or the members thereof," preventing a "rapidly expanding Government work force" from being "employed to build a powerful . . . political machine," ensuring that "employment and advancement in the Government service not depend on political

---

restrictions that had formerly been imposed through appropriations act riders. Act of May 29, 1999, 76th Leg., R.S., ch. 1498, § 1, secs. 556.004-.005, 1999 Tex. Gen. Laws 5153, 5153-54; *see* Senate Comm. on Finance, Bill Analysis, Tex. S.B. 177, 76th Leg., R.S., 1999.

performance," and shielding employees "from pressure and express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with superiors." *Letter Carriers*, 413 U.S. at 566-67. In light of these origins and purposes, the federal courts have long held that the "political" activities targeted by the enactments are *partisan* political activities, those directed toward the success of a political party. *See United Pub. Workers v. Mitchell*, 330 U.S. 75, 100 (1947).

Some version of these restrictions on government employees' political activities has since been replicated in every state, including Texas. Although there appear to be no reported Texas judicial decisions on point, the Attorney General, analyzing statutes with language materially similar to subsections (c) and (d) of section 556.004, has concluded that the Texas enactments are modeled on the Hatch Act and prohibit only partisan or electoral political activities. *See* Opinion No. MW-149 (1980) (restriction on DPS employees); Opinion No. M-1099 (1972) (restrictions on department of public welfare employees). Courts applying other states' parallel political-activity restrictions have reached similar conclusions. *See Bauers v. Cornett*, 865 F.2d 1517, 1524-27 (8th Cir. 1989) (Missouri prohibition on soliciting financial assistance from state employees for "any political party, candidate, political fund, or publication, or for any other political purpose" tied to elections having substantial political-party participation); *Montana Sports Shooting Ass'n, Inc. v. State of Montana*, 185 P.3d 1003, 1005-09 (Mont. 2008) (prohibition against agency employee using "official authority or influence for the purpose of . . . influencing the political actions of any person or body" did not bar agency employees from lobbying legislature; U.S. Supreme Court's precedents supported "decision to limit the phrase 'political actions' to partisan politics"); *Heidtman v. City of Shaker Heights*, 126 N.E.2d 138, 142-43 (Ohio 1955) (city

20

employee's circulating of initiative petition did not violate local prohibition on "political activity"; term referred to "politics in its narrower partisan sense").

We must presume that the legislature was familiar with these connotations of "political" purpose when enacting a statute of this type. *See State v. Young*, 265 S.W.3d 697, 703 (Tex. App.—Austin 2008, pet. denied). These connotations, along with the structure of subsection (c), lead us to conclude that the legislative focus of government code section 556.004, subsection (c), is on preventing state officers and employees from using their official authority or influence or permitting the use of state agency programs to achieve "political purposes" related to candidate elections and partisan politics, as opposed to achieving more general influence on public policy. TURF complains only of the latter.

In its live petition, TURF alleges that "[f]ollowing a legislative session [2007] in which it was roundly criticized for its advocacy of an expansive toll road policy, TxDOT launched a political campaign called "Keep Texas Moving" ("KTM") in an attempt to advocate a public policy of tolling most roads in Texas. As federal, state, and local officials debate and vote on the advisability of this policy, and the public weighs in on the issue via environmental clearance hearings, TxDOT has sought to influence this political issue with its KTM campaign." TURF further pleads that "the KTM campaign is a one-sided attempt to advocate one political point of view on a highly controversial matter that is far from politically decided" and that TxDOT is engaging in "blatant advocacy for a toll road policy throughout the state."

Similarly, TURF relies on evidence that, in its view, demonstrates that the KTM campaign is "political advocacy" intended "to skew the political debate in Texas in favor of

21

expansive toll road policy." This includes materials from the marketing firm that devised the KTM campaign, which reflect that a major focus of the campaign was to combat what had been determined from polling to be "very low overall public awareness" regarding "the TTC and toll roads" combined with "negative press" generated by "persistent local opposition and the series of public meetings held around the state regarding the Trans-Texas Corridor." Goals of the campaign included "creat[ing] an informed public about the benefits of the TTC and tolls," "mitigat[ing] negative press," and "implement[ing] a sustainable and measurable means for TxDOT to proactively inform and involve the public on the agency's strategic initiatives." The record also includes advertisements, screen shots from the "Keep Texas Moving" website, and TxDOT training materials used to prepare representatives for talk-radio appearances, which reflect the messaging that road congestion in Texas is a problem, that Texas's population growth is outpacing traditional transportation-funding mechanisms, that TxDOT has innovative solutions for the problem that include, but are not limited to, toll roads and the TTC concept, and that toll roads and the TTC concept have numerous benefits. Citing expert affidavits, TURF attacks various TxDOT assertions regarding toll roads as "slanted," "unsupported," or "false." TURF also cites evidence to the effect that issues relating to toll roads and the TTC have been controversial, that individual citizens and grassroots groups like TURF had spoken out in opposition to these sorts of projects, and that various plans and proposals related to such projects were currently being debated at public hearings and other fora.

While these allegations and evidence, if taken as true, might reflect agency efforts to influence public opinion (and, ultimately, public policy) concerning TTC projects or tolling,

TURF has not alleged nor presented evidence of the sorts of "political purposes" that are the concern of subsection (c). In fact, the evidence is to the contrary. In his deposition, Chase testified that TxDOT had postponed the KTM media effort until June 2007 so it would not coincide with either the 2006 governor's race or the 2007 legislative session. We also observe that during Saenz's deposition, TURF's counsel, while questioning the witness regarding his understanding of chapter 556.004(c)'s limits, acknowledged "I know you're not doing that" when posing a hypothetical of TxDOT using "tax money to promote Governor Perry as part of its promotion of toll roads." The closest TURF comes to raising a fact issue regarding "political purpose" is an affidavit from a Bexar County commissioner who "believe[d] that TxDOT's Keep Texas Moving campaign constitutes an indirect political attack on me and other public officials who question the advisability of an extensive toll road policy" in that it "implies that those public officials . . . are not in favor of 'keeping Texas moving.'" Without more, we cannot conclude that these statements raise a fact issue as to the sort of nexus with partisan and electoral politics required to violate subsection (c). We conclude that TURF has failed to state a claim to restrain actions ultra vires of section 556.004 and lacks standing to assert its claims predicated on violations of that provision.[14]

---

[14] As one of its responses to TURF's arguments concerning government code section 556.004, the officials have asserted that the KTM campaign is specifically authorized by section 228.004 of the transportation code, which provides:

> The department may, notwithstanding Chapter 2113, Government Code, engage in marketing, advertising, and other activities to promote the development and use of toll projects and may enter into contracts or agreements necessary to procure marketing, advertising, or other promotional services from outside service providers.

Tex. Transp. Code Ann. § 228.004 (West Supp. 2009). Even if the KTM campaign somehow violated government code section 556.004(c), they reason, transportation code section 228.004's

23

*Statutory prohibitions against "lobbying" by state agencies*

TURF also asserts that it stated a claim for violations of two provisions of government code chapter 556 that restrict lobbying by state agencies. First, it relies upon the following prohibition in section 556.005:

> A state agency may not use appropriated money to employ, as a regular full-time or part-time or contract employee, a person who is required by Chapter 305 to register as a lobbyist.

Tex. Gov't Code Ann. § 556.005(a) (West 2004). The "Chapter 305" referenced in the provision refers to chapter 305 of the government code, which requires that a person who receives a specified amount of compensation for "communicat[ing] directly with one or more members of the legislative or executive branch to influence legislation or administrative action" must register and disclose his clients and amount of compensation. *See id.* § 305.003-.005 (West 2005 & Supp. 2009). Second, TURF relies upon government code section 556.006:

> Sec. 556.006. LEGISLATIVE LOBBYING. (a) A state agency may not use appropriated money to attempt to influence the passage or defeat of a legislative measure.

---

specific authorization would control over the general prohibition. *See* Tex. Gov't Code Ann. § 311.026 (West 2005). Because we have concluded that TURF has not stated a claim for violations of government code section 556.004, we do not address the implications of transportation code section 228.004. For the same reasons, we do not reach arguments advanced by TURF that section 228.004 is unconstitutional. TURF also argues that section 228.004 is preempted by the Hatch Act. While we need not reach the preemption question, we address TURF's stand-alone Hatch Act claim below.

24

(b)   This section does not prohibit a state officer or employee from using state resources to provide public information or to provide information responsive to a request.

*Id.* § 556.006 (West 2004).

In its live petition, TURF alleges that "TxDOT has hired lobbyists and openly lobbied local, state, and federal officials in support of TxDOT's desire to toll existing federal interstate highways and other tolling initiatives that are not yet in development." TURF further pleads that "Defendants have directed the expenditure of public funds to lobby the United States Congress in favor of a policy of expanding toll roads and tolling existing interstate highways." TURF seeks to restrain "any attempt to lobby any governmental unit or official in favor of any policy or legislative measure to expand or change toll road policy and/or any attempt to hire lobbyists required to be registered with the Texas Ethics Commission under [chapter] 305 of the [government code]."

Like TURF's allegations regarding the "political" purpose of the KTM campaign, whether the agency has "lobbied" or "hired" a "lobbyist" in any sense relevant to sections 556.005 or 556.006 depends on what those provisions mean and the specific conduct that is the basis for TURF's claims. As further elucidated by the evidence on which it relies, TURF is complaining primarily about conduct by the Rodman Company in its outreach efforts to audiences in the TTC-69 study area. Some of these efforts were aimed at gaining support for the project from local officials, including at least one instance where there is evidence that a Rodman Company subcontractor was involved in garnering a supportive formal resolution from a county commissioner's court. There was also evidence that the Rodman Company provided "Federal Outreach" to "educate audiences about issues of importance to [TxDOT] and the successful implementation of TxDOT's

25

federal legislative agenda." In TURF's view, these facts constitute violations of section 556.006's prohibition against TxDOT's using appropriated money "to attempt to influence the passage or defeat of a legislative measure." TURF also emphasizes evidence that the Rodman Company subcontracted with Gary Bushell, L.L.P. for communications and outreach to local officials and that Gary Bushell, L.L.P., is registered under chapter 305. This, TURF reasons, constitutes a violation of section 556.005's prohibition against using appropriated money "to employ, as a regular full-time or part-time or contract employee, a person who is required by Chapter 305 to register as a lobbyist."

We do not reach these contentions because the evidence conclusively demonstrates that the Rodman Company's work in connection with the TTC-69 had ended by March 2008. As previously explained, TURF's associational standing derived from the taxpayer standing of its members is limited solely to challenging future or ongoing illegal expenditures. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 556-58. However, TURF's justiciable interest in its claims—even if meritorious—dissipated once the funds were spent. *See id.* at 556. Consequently, TURF lacks standing to prosecute claims predicated on the Rodman Company's actions.

TURF additionally relies on an affidavit from an attendee at the February 1, 2008 "Eminent Domain SuperConference," Hank Gilbert. Gilbert recounted that appellees' counsel of record "gave a brief overview of all the eminent domain legislation that had been presented during the 80th Regular legislative session," including H.B. 2006, which would have placed various restrictions on the eminent domain powers of governmental units.[15] According to Gilbert, counsel "listed various portions of the bill that TxDOT objected to," "by her own admittance, she attended

---

[15] H.B. 2006 passed both houses of the legislature but was vetoed by the governor.

26

a 'closed door' meeting on behalf of TxDOT with other lobbyists," and "was asking, on their behalf (TxDOT), to include $100 million for the access portion of HB 2006." However, as with TURF's complaints about the Rodman Company's activities, TURF lacks standing to enjoin any expenditures for any activities by counsel that would have violated section 556.006, which would have occurred not later than May 2007.

Finally, TURF relies on evidence that TxDOT has long engaged in federal legislative advocacy and continues to do so. This includes deposition testimony from a TxDOT official who acknowledged that the agency has a federal legislative agenda and hired "consultant lobbyists" in Washington D.C. to help seek federal funds and other favorable measures from the Congress or federal agencies. The officials respond in part that section 556.006's lobbying prohibition does not extend to federal legislation. They observe that section 751.005 of the government code creates an agency, the Officer of State-Federal Relations (OSFR), that is authorized to advocate for federal legislation on behalf of the State. *See* Tex. Gov't Code Ann. § 751.005(b)(5)(C) (West Supp. 2009). OSFR is further authorized to enter into interagency contracts with other state agencies to locate staff of the other agencies in Washington D.C. to work under the OSFR director's supervision, and OSFR has done so with TxDOT. Especially in light of these legislative authorizations for federal legislative advocacy, we agree that the legislature did not intend section 556.006's lobbying prohibition to extend to federal legislation.

We conclude that TURF lacks standing to assert its claims regarding government code sections 556.005 and 556.006 and, further, has not stated a claim of ultra vires conduct with respect to TxDOT's federal legislative advocacy.

*Hatch Act*

Finally, in addition to relying on the foregoing prohibitions in chapter 556 of the government code, TURF asserts that it has stated a claim that expenditures made in connection with the KTM campaign violate provisions of the federal Hatch Act that extend to certain state and local government employees. *See* 5 U.S.C.A. §§ 1501-08 (2007). Specifically, TURF relies upon a prohibition against "a state or local officer or employee . . . directly or indirectly . . . command[ing] or advis[ing] a state or local officer or employee to pay, lend, or contribute anything of value to a political party, committee, organization, agency or person for political purposes." *Id.* § 1502(a)(2). As previously explained, the "political" activities and purposes that are restricted by the Hatch Act have long been construed as limited to partisan political activities. *See Letter Carriers*, 413 U.S. at 562; *Bauers*, 865 F.2d at 1523-24. There are no allegations or evidence of that sort of "political" purpose or activity here. Accordingly, TURF has not stated a claim of actions ultra vires of the Hatch Act and lacks standing to assert its claims predicated on that provision.

*Conclusion regarding TURF's claims*

Although the officials advance other grounds for affirming the dismissal of TURF"s claims, we need not address them. For the foregoing reasons, we hold that the district court did not err in granting the officials' plea to the jurisdiction. We overrule TURF's first issue.

**Procedural issues**

In its second issue, TURF argues that the district court abused its discretion in refusing to grant it a second continuance of the hearing on appellees' plea to the jurisdiction. We

28

have previously summarized the procedural history of this case, including the facts that the district court had already granted TURF one ninety-day continuance of the hearing to conduct discovery—a postponement that ultimately exceeded five months—and that TURF had the opportunity to obtain several depositions from TxDOT personnel and document discovery in the interim. Furthermore, the district court granted TURF leave after the hearing to supplement the record with over one-hundred pages of additional documentary evidence. On this record, we cannot conclude that the district court abused its discretion in denying TURF's second continuance motion.

TURF also complains that appellees' plea to the jurisdiction "deeply implicates the merits of Appellant's causes of action" and that resolution of these issues turned on intent, motive, and credibility—namely, whether expenditures made in connection with the KTM campaign were motivated by a "political purpose." Consequently, TURF reasons, it was an abuse of discretion for the district court to resolve those issues at the jurisdictional stage. *See Hendee*, 228 S.W.3d at 369 ("[A] trial court must exercise sound discretion in determining whether a jurisdictional determination impacting the merits 'should be made at a preliminary hearing or await a fuller development of the case . . . .'" (quoting *Miranda*, 133 S.W.3d at 227)). However, as we recently explained, "[w]hile genuine disputes over the existence of facts material to jurisdiction will preclude dismissal, *see Miranda*, 133 S.W.3d at 227-28, the pure legal question of whether pled and un-negated facts would establish . . . ultra vires conduct can—and must—be resolved to determine the trial court's jurisdiction, and this is true regardless of whether that issue parallels the merits." *Creedmoor-Maha Water Supply Corp.*, 307 S.W.3d at 516 (citing *Hendee*, 228 S.W.3d at 368-69); *see also Miranda*, 133 S.W.3d at 227 (emphasizing that jurisdictional issues should be resolved "as soon as

29

practicable"). Here, as we have detailed above, whether TURF stated claims for violations of government code section 556.004(c) or the Hatch Act turns on a pure question of law—construction of "*political* purpose" as used in those provisions—and was properly resolved by the district court in determining its subject-matter jurisdiction.

We overrule TURF's second issue.

## CONCLUSION

Having overruled both of TURF's issues, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;
   Concurring Opinion by Justice Patterson

Affirmed

Filed: August 20, 2010